COMMONWEALTH vs. JOHN F. COLELLA.

Suffolk.   September 13, 1971. — October 5, 1971.

Present: CUTTER, REARDON, BRAUCHER, & HENNESSEY, JJ.

*Trespass. Search and Seizure. Public Officer. Lobster.*

In the absence of an emergency situation, law enforcement officers as
a matter of precaution and policy should obtain a search warrant
in making inspections or entries upon land, particularly if there is
a dwelling thereon, even though a statute makes such a step seem
unnecessary. [150]

Upon charges under G. L. c. 266, § 60, of receiving stolen property and
under c. 130, § 31, of using, injuring, and molesting certain lobster
pots, it was reversible error for a judge to allow a motion to
suppress as evidence lobster pots, some with identifying buoys,
which were piled in plain view near the bank of a river on open
land not shown to be in a substantially enclosed area closely
connected and used with a dwelling, where it appeared that,
although a natural resource officer who ultimately seized the pots
in the defendant's presence and with his consent on the day
following the officer's first entry on the land never had a search
warrant, the officer had probable cause to believe, when he made
his first entry on the land after unsuccessful attempts to "rouse"
someone at houses nearby, that the defendant, who possessed a
boat rigged and used for taking lobsters, was in possession of
lobster pots which were not his own, and that the officer's first
entry on the land was pursuant to c. 21 § 6D, as amended by St.
1964, c. 524, § 4, and merely confirmed and added detail to his prior
knowledge. [145–150, 151]

TWO INDICTMENTS found and returned in the Superior
Court on March 4, 1970.

Upon an interlocutory appeal by the Commonwealth
from the allowance of a motion to suppress, the case was
reported by *Spiegel*, J., in the Supreme Judicial Court for
the county of Suffolk.

*Edward W. Kirk*, Deputy Assistant Attorney General,
for the Commonwealth.

*David Berman* (*Victor J. Garo* with him) for the defendant.

CUTTER, J.   Colella is charged under G. L. c. 266, § 60,

with receiving stolen property and, under G. L. c. 130, § 31, with using, injuring, and molesting certain lobster pots. This is an interlocutory appeal by the Commonwealth under G. L. c. 278, § 28E (inserted by St. 1967, c. 898, § 1) from the allowance by a Superior Court judge of a motion to suppress evidence consisting of lobster pots allegedly misappropriated. A single justice of this court reserved and reported the appeal for the determination of the full court.

In the Superior Court, with respect to the motion to suppress, evidence was introduced through a natural resource officer, Lawrence M. Nagle. The evidence is summarized below.

Joseph Pesce, a Saugus lobsterman, approached Officer Nagle on October 21, 1969, in Saugus, and reported that "he was missing a number of lobster pots" from "an area off Winthrop." A blue and white boat (which he had seen before in Pines River, Revere) was in the vicinity of the pots just before he discovered them to be missing. Pesce saw a person on the boat (which on its side had a decal of "a hippie flower . : . in the shape of a daisy") watching him through binoculars. Officer Nagle undertook an investigation.

On October 22, Officer Nagle and another natural resource officer went by motor vehicle along the Mystic River. They did not then find the blue and white boat. On October 26, during a helicopter inspection of the general Mystic River area, Officer Nagle observed in Medford a blue and white boat rigged as a lobster boat. He circled the area "a number of times quite low." He saw, from a height of about 300 feet, a lobster pot on the boat, and, about fifty to sixty feet from the boat, a pile of lobster pots on which there were three buoys. Two were similar to each other; one dissimilar. He could see a "hippie flower" on the boat's side.

On October 27, Officer Nagle went to an area across the Mystic River about seventy to 100 feet from property at 11 West Street, Medford. Through binoculars he saw on

the land lobster buoys of different colors on top of lobster pots and also a lobster pot on the boat. Officer Nagle then crossed the river and drove to a point near 11 West Street. He saw from the sidewalk, by looking about 100 feet down the driveway, the same pots and buoys previously seen from the helicopter and from across the river. He obtained no response when he knocked at the door of 11 West Street. He then ascertained that an automobile in the yard was registered in the name of John Colella. This led him to ring the back doorbell of another house on West Street (two doors from number 11) marked "Colella." There also he received no response. After banging on the back door of 11 West Street, he "went down to the back yard" and in the pile of lobster pots saw some buoys which he thought belonged to Pesce, two which belonged to Berger Martinson, and a buoy marked "KAM."

Officer Nagle then took Pesce to 11 West Street. Again he attempted without success to "rouse someone" at the house. They went "down the yard." Pesce "recognized his pots prior to even getting close to them." He then looked over the pots and saw "a variety of pots which belonged to people he knew."

On October 28, Officer Nagle had a conversation at 11 West Street with Colella in the presence of other representatives of his department and Medford police officers. Colella "readily agreed' that the pots "would be confiscated" and taken to the State park at Topsfield. At no time did Officer Nagle have a search warrant to go on the premises.

Officer Nagle testified that lobstermen use buoys for identification. Each one has standard markings and a color scheme assigned by the Director of the Division of Marine Fisheries. The markings include an identification, such as initials, numerals, or marks.[1] It would be "quite

---

[1] General Laws c. 130, § 38 (as amended through St. 1960, c. 642; see later amendments by St. 1969, c. 737, §§ 1 and 2, and St. 1970, c. 861, §§ 2, 3, 4), provides that the director may grant to defined eligible persons "a license to catch or take . . . lobsters . . . from . . . coastal waters." It further provides that "[e]ach applicant for a license under this section shall

unusual" for a "lobsterman to have several colored buoys." Officer Nagle could observe the diversity of colors on the buoys across the Mystic River.

General Laws c. 21, § 6D (as appearing in St. 1964, c. 524, § 4), provides that the Commissioner of the Department of Natural Resources (see G. L. c. 21, § 1, as amended through St. 1968, c. 736, § 1, and § 6 and subsequent sections, as amended through St. 1964, c. 524), the director of the division of law enforcement in that department, "and his assistants, natural resource officers and deputies may in the performance of their duties enter upon and pass through or over private property or lands whether or not covered by water, and may keep or dispose of sick, injured or helpless fish, birds or mammals, that may come into their possession, subject to such rules and regulations as the director, with the approval of the commissioner, is hereby authorized to adopt." [2]

In *Thurlow* v. *Crossman*, 336 Mass. 248, 250–252, this court treated c. 21, § 6D, as permitting a natural resource officer to enter the driveway of certain "premises to investigate suspected illegal activities relating to the taking

---

state the color scheme or other special markings of the buoys desired to be used by him, which, if approved by the director, shall be set forth in his license, and all buoys used by him shall be marked accordingly, and all buoys, pots, traps and lobster cars used by him shall be marked with the licensee's initials or name or the number assigned to him by the director, which shall be branded or cut into the surface thereof."

[2] A related statute is G. L. c. 130, § 9 (as amended through St. 1964, c. 524, § 8), which reads in part (emphasis supplied): ". . . a natural resource officer . . . may, without a warrant, search any boat, vessel, fish car, bag, box, locker, package, crate, *any building other than a dwelling house,* any motor vehicle . . . or other vehicle, or any other personal property in which he has reasonable cause to believe, and does believe, that *fish* taken . . . or held for transportation or sale in violation of law, may be found, and may seize any such *fish* . . . and *may seize* any boat . . . box . . . package, crate . . . *or any other personal property used in a violation of the laws relative to marine fisheries* and hold the same for forfeiture. Any such . . . officer may arrest without a warrant any person found violating any provision of this chapter or of any ordinance, rule or regulation made under authority thereof, or any other provision of law relative to marine fisheries." Although this section purportedly permits warrantless searches, in instances mentioned in the section, c. 130, § 10, permits an authorized officer to issue warrants to search for illegally held *fish* in marine fisheries matters. There is no indication, however, in this record that Officer Nagle was looking for lobsters illegally taken. He was trying to find stolen lobster pots. Chapter 21, § 6D, appears to be the sole provision which deals with the warrantless entry upon land.

of shellfish." We regarded the entry as "lawful" and not a trespass, and said (at p. 250, emphasis supplied), "Such right of entry and passage was not . . . an unlawful limitation on . . . [the owner's] right to the exclusive use of her land. . . . '[R]ights of property are held subject to such reasonable control and regulation of the mode of keeping and use as the legislature, under the police power vested in them by the Constitution of the Commonwealth, may think necessary for the . . . security of the public health and welfare.' . . . It is held generally at common law that public officers may legally enter upon *land* privately owned when necessary to carry out their official duties. Instances in point" were listed in the opinion (see pp. 250–251).

In *Commonwealth* v. *Murphy,* 353 Mass. 433, we interpreted c. 21, § 6D, and also (see fn. 2, *supra*) considered (pp. 435–436) c. 130, § 9. A natural resource officer had gone upon privately owned land, including that of the defendant. He looked through a window into a garage "within the curtilage" of the defendant's house. He and other officers later, from the defendant's driveway, looked into the garage through an open door. They saw illegally taken short lobsters inside. We held (p. 436) that *"buildings* within the curtilage are entitled to the same protection as the dwelling house itself" (emphasis supplied). We left undecided the question (p. 437) "whether a simple trespass would render inadmissible the evidence sought to be suppressed . . . because the officers [by virtue of c. 21, § 6D] were not trespassers" and (p. 438) "were lawfully on the . . . premises when short lobsters were observed through the . . . door." We ruled that to "look at what is in plain view cannot be called a search and does not violate either the Fourth or Fifth Amendment to the United States Constitution." Because c. 130, § 9, authorized an arrest without a warrant, "[t]he seizure . . . was incidental [p. 439] to a lawful arrest."

The present case, we think, falls within principles applied in the *Thurlow* and *Murphy* cases. Officer Nagle, before he entered the land at 11 West Street, knew of circumstances

tending to establish Colella's possession of lobster pots not his own. This knowledge he gained at least as early as his observation of the multi-colored lobster buoys from the helicopter and (over a shorter distance) from across the Mystic River. When he confirmed his suspicions (under the authority of c. 21, § 6D) by entering the land near or behind 11 West Street, he was not a trespasser. He never entered any building on the premises, either within or without the "curtilage." Whether the pile of lobster pots was within a fenced or partially fenced area is not established by the evidence, although there was a bald assertion by defence counsel in argument that there was "a fence on one side" of the area where the lobster pots lay, "a set of bushes on the other side, and the open sea [apparently the Mystic River] to the rear of the dwelling." Even if we were to assume that such bounds might constitute a "curtilage" (cf. *Rosencranz* v. *United States*, 356 F. 2d 310, 313 [1st Cir.]; *Wattenburg* v. *United States*, 388 F. 2d 853, 856–857 [9th Cir.]; *United States* v. *Davis*, 423 F. 2d 974, 976–979 [5th Cir.], cert. den. 400 U. S. 836), we think that § 6D was intended to permit a wide range of entries upon land, excluding only entry of dwellings and buildings intimately used or connected with dwellings (and possibly plainly and adequately fenced garden or similar areas very close to a dwelling which show the owner's reasonable expectation of privacy similar to that usual within a dwelling).

These lobster pots were piled in plain view[3] near the bank of a river on open land and not in buildings. In the absence of proof that they were in a substantially enclosed area, closely connected and used with a dwelling for residential purposes, Officer Nagle's inspection of them was justified by c. 21, § 6D, as our cases have interpreted that section. Colella possessed a boat rigged and used for taking lobsters. The statutes (see fn. 1) required that he have a license to

---

[3] For cases dealing with items in "plain view," in addition to those cited in the *Murphy* case (353 Mass. 433, 438), see *Katz* v. *United States*, 389 U. S. 347, 351–352; *Harris* v. *United States*, 390 U. S. 234, 236; *Fagundes* v. *United States*, 340 F. 2d 673 (1st Cir.).

engage in that regulated occupation or avocation affecting public natural resources. The Legislature, in our opinion, has reasonably provided in § 6D for the natural resource inspection of at least land and equipment used for purposes subject to statutory natural resource regulation.

Some recent search and seizure cases in the Federal courts, including some cited above (e.g. *United States* v. *Davis*, 423 F. 2d 974 [5th Cir.]), have applied more broadly than do our own cases the concept of "curtilage." In other cases, the principles affecting the seizure of items within "plain view" (see fn. 3) or in "open fields" (see *Hester* v. *United States*, 265 U. S. 57, 59; *McDowell* v. *United States*, 383 F. 2d 599, 603 [8th Cir.], and cases cited; cf. Am. Law Inst., Model Code of Pre-Arraignment Procedure, § 6.04 [Tent. draft No. 3, Apr. 24, 1970]) perhaps have been somewhat modified, although the subject remains filled with uncertainties. See *Coolidge* v. *New Hampshire*, 403 U. S. 443, 464–465, 475, 483, 490–491, 496–500, 503–510, 513–521. There has been restriction of State freedom in making sanitary and public health inspections, to which natural resources inspections are somewhat analogous. See *Camara* v. *Municipal Court of San Francisco*, 387 U. S. 523, 530–539, which may leave unanswered questions with respect to entries on land areas outside buildings.

Obviously these recent developments make it expedient, as a matter of precaution and policy, even if it may seem unnecessary because of c. 21, § 6D, for natural resource officers (and other law enforcement officers), in making inspections or entries upon land (particularly land on which there is a dwelling), to obtain a search warrant at least where no emergency situation makes that impossible or inappropriate. The future trend of Federal decisions is uncertain, and State law enforcement officials should take special precautions to reduce risk of suppression of relevant evidence. Such a cautious course will tend to avoid litigation and uncertainty likely to cause more expense and inconvenience than that involved in taking careful steps to obtain a valid search warrant.

Such admonitions for the future, however, do not serve to decide the present case. We deal with it on the facts shown on this record. Officer Nagle, before he went upon the premises at 11 West Street, had probable cause to believe that Colella was in possession of buoys and pots not his own. The entry (not a trespass under c. 21, § 6D) merely confirmed and added detail to his prior knowledge. He made no seizure when he entered. Even if the entry on the land would now be regarded as improper under recent decisions, Officer Nagle's basic and essential knowledge was not the fruit of that entry. His ultimate seizure of the lobster pots was in Colella's presence and (as we read the record) with his consent.

In the light of c. 21, § 6D, and the final provisions of c. 130, § 9, as interpreted in the *Thurlow* and *Murphy* cases, if there were any search and seizure at all, it was not unreasonable on this record. The entry, authorized by c. 21, § 6D (dealing with lobster operations and other activities regulated by statute), was made only after attempts to "rouse" someone at two houses on West Street. There was no inconsiderate or unfair law enforcement action which should require suppression of relevant evidence in order to ensure proper official conduct in the future.[4]

We conclude that Colella, on this record, has not sustained the burden resting upon him. See *Commonwealth* v. *Fancy*, 349 Mass. 196, 202-203. Cf. *Commonwealth* v. *Cohen,* 359 Mass. 140, 146, fn. 2. The order suppressing the evidence is reversed. The case is remanded to the Superior Court for further proceedings.

*So ordered.*

---

[4] The trial judge dealt with this matter somewhat ambiguously. He may have thought that he had to decide whether the entry upon the land constituted a proper search incident to an arrest. That was not the issue. Indeed, the record does not clearly show whether Colella ever was arrested. Also, the ultimate seizure appears to have been with his consent. The real questions were (a) whether Officer Nagle's entry on the land was an unlawful trespass or search, and (b) whether the later taking of the lobster pots was so directly the consequence of that entry, if illegal, as to require suppressing the evidence.