COMMONWEALTH *vs.* EDWARD FRAZER.

Middlesex. April 11, 1980. — August 25, 1980.

Present: GREANEY, PERRETTA, & DREBEN, JJ.

*Search and Seizure.*

At a hearing of a motion to suppress, there was sufficient evidence to warrant findings that an alleyway next to a multiple-family dwelling in which the defendant lived was a common area in which the defendant could have no reasonable expectation of privacy and that police officers could, therefore, properly enter the alleyway without a search warrant and thereby be in a position to see stolen property in plain view. [431-433]

INDICTMENT found and returned in the Superior Court Department on February 16, 1979.

A motion to suppress evidence was heard by *Young, J.,* and the case was heard by *Morse, J.*

*Dennis J. Sullivan* for the defendant.

*Robert L. Rossi,* Assistant District Attorney, for the Commonwealth.

PERRETTA, J. After a jury-waived trial in the Superior Court, the defendant was found guilty of receiving stolen property having a value of more than one hundred dollars. G. L. c. 266, § 60, as amended through St. 1973, c. 624. He alleges error in the denial of his motion to suppress evidence which he claims was illegally seized. We affirm the judgment.

We summarize the relevant facts as they appear from the judge's findings and from the transcript of testimony presented at the hearing on the motion. The judge's subsidiary findings of fact will be accepted by an appellate court in the absence of clear error, but his ultimate legal conclusions, though we accord them substantial deference,

are open to our review. *Commonwealth* v. *Jones*, 375
Mass. 349, 354 (1978). *Commonwealth* v. *Accaputo*, 380
Mass. 435, 448 n.18 (1980). Shortly before 5:00 A.M. on
February 6, 1979, the Cambridge police received a report of
a break into the VFW Post on Green Street in Cambridge.
Responding to this report, Officers Dwyer and White pro-
ceeded to the Post and found it had been ransacked. They
saw that a rifle had been left on the floor near the site of the
break into the building and that a liquor cabinet had been
forced open. They also observed footprints in plaster dust
on the floor.

Minutes later Dwyer and White received a radio report
that a man carrying a firearm and a bottle of liquor was
walking on Auburn Street in the direction of Magazine
Street.[1] They drove along Magazine Street until they saw a
man, about 100 feet away, in front of a multiple-family
dwelling at 174 Auburn Street. The man appeared to be
carrying something. He disappeared into an alleyway
located between 174 Auburn Street and the adjoining prop-
erty. The officers turned onto Auburn Street, and they saw
the man emerge empty-handed from the alleyway, proceed
to the front entrance of 174 Auburn Street, and enter the
building. The defendant was known to the officers, and at
this time they recognized him. Dwyer and White got out of
their car and walked down the alleyway. They observed in
plain view on a porch attached to the right-rear section of
the 174 Auburn Street building two bottles of liquor of a
kind which the police had seen in the liquor cabinet at the
VFW Post. They seized the liquor and returned to their
cruiser to summon an additional officer. Upon his arrival,
the three officers went to the front entrance of the building
and knocked at the door to the defendant's apartment. It
was then about 5:15 A.M., and the officers had made no at-
tempt to obtain a search warrant.

---

[1] Auburn and Green streets are parallel to each other, and they intersect
Magazine Street at right angles; the intersections are two blocks apart.

When the defendant's mother answered the door, the officers told her that there had been a break in a neighborhood building, and they asked to speak with the defendant. She let them into the apartment and led them to her son's room. The defendant was in bed, and his sneakers were on the floor near the bed. The officers spoke with the defendant, asking him if they could take one of the sneakers to the VFW Post and compare its tread with the footprints they had seen in the plaster dust. After some hesitation the defendant agreed, and Dwyer and White proceeded to the VFW Post, leaving the additional officer behind. When the officers discovered that the sneaker tread matched one of the footprints, they returned to the defendant's home and arrested him. They took a hatchet, a screwdriver, a flashlight, and a roll of quarters, all of which were in plain view in the defendant's room. At the Cambridge police station, the defendant revealed that he had hidden a rifle from the VFW Post in a closet in the apartment. The officers took the rifle later that day with the consent of the defendant's mother.

Based upon these facts, the issue before us is whether the judge was correct in concluding that the officers could properly enter the alleyway without a search warrant and thereby be in a position where they could see the liquor bottles in plain view. See *Harris* v. *United States*, 390 U.S. 234, 236, (1968); *Accaputo*, 380 Mass. at 447. The focus of our inquiry is whether this alleyway was an area in which the defendant could have a reasonable expectation of privacy. *Katz* v. *United States*, 389 U.S. 347, 351-352 (1967). *Commonwealth* v. *Boswell*, 374 Mass. 263, 269 (1978). *United States* v. *Cruz Pagan*, 537 F.2d 554, 557-558 (1st Cir. 1976).

The building at 174 Auburn Street is a three-story, five-family dwelling in which the defendant's family rented a ground-floor apartment. The alleyway is between the right side of the building and the rear of another multiple-family dwelling which fronts on Magazine Street. It leads from the Auburn Street sidewalk to the backyard, where there is a porch and rear entrance to the first-floor apartment, a

second-floor porch, and a bulkhead providing access to the basement of the building. Although there is a fence in front of the building, the entrance to the alleyway is open and without a gate. The alleyway is used by the defendant's family, the occupants of an upstairs apartment, and children living in the multiple-family dwelling on the other side of the alleyway.[2]

The judge was not in error in concluding that the alleyway was a common area in which the defendant could have no reasonable expectation of privacy. The alleyway was neither owned by the defendant or his family nor reserved for their exclusive use. It was freely accessible to other tenants and their guests, as well as to the children of another building. The record offers no indication that the defendant or his family exercised any control over access to the alleyway. In view of all these circumstances, we conclude that any expectation of privacy that the defendant might have felt was not reasonable in the constitutional sense. See *Katz,* 389 U.S. at 361 (Harlan, J., concurring); *Rakas v. Illinois,* 439 U.S. 128, 151-153 (1978) (Powell, J., concurring). Compare *Commonwealth v. Thomas,* 358 Mass. 771, 773-775 (1971); *Commonwealth v. Dinnall,* 366 Mass. 165, 166-167 (1974); *Boswell,* 374 Mass. at 269. Contrast *Commonwealth v. Hall,* 366 Mass. 790, 794-795 (1975); *United States v. Case,* 435 F.2d 766, 768-769 (7th Cir. 1970); *Fixel v. Wainwright,* 492 F.2d 480, 484 (5th Cir. 1974).

The defendant suggests that what might otherwise have been a permissible entry into the alleyway was rendered illegal in this case by the circumstance that the entry occurred in the pre-dawn hours. He offers no authority for his position, and we have found none.[3] The fact that his

---

[2] There was testimony that other tenants had a separate entrance and that they did not use the backyard. The judge, however, was not required to believe the defendant's mother's testimony that those residents never used the rear yard, or to infer from that testimony that they did not use the alleyway. *Commonwealth v. Mahnke,* 368 Mass. 662, 691, cert. denied, 425 U.S. 959 (1975).

[3] The defendant has cited *Dorman v. United States,* 435 F.2d 385 (D.C. Cir. 1970). That case supports the proposition that the time of day may

experience may have led him to anticipate that the alleyway would be deserted at the time the entry took place is not the controlling factor. *Rakas*, 439 U.S. at 143 n.12, and at 151 (Powell, J., concurring). In neither *Thomas* nor *Hall*, *supra*, did the court appear to have deemed it relevant to the Fourth Amendment issue of reasonableness that the entries there in dispute occurred in the late night or early morning hours, and we are unpersuaded that the time of the officers' entry into the open alleyway is relevant to that issue in the circumstances of the instant case.

Our resolution of the issue of the legality of the officers' warrantless entry into the alleyway makes it unnecessary for us to consider the defendant's remaining contention based upon *Wong Sun* v. *United States*, 371 U.S. 471 (1963).[4]

*Judgment affirmed.*

---

be relevant to the reasonableness of a warrantless entry into an admittedly private dwelling for the purpose of making an arrest. *Id.* at 393. See also *Commonwealth* v. *Forde*, 367 Mass. 798, 807 (1975); *Commonwealth* v. *DiSanto*, 8 Mass. App. Ct. 694, 699-703; *Boswell*, 374 Mass. at 270. It does not bear upon the question whether it is reasonable to expect privacy in a particular area.

[4] Moreover, the judge found that notwithstanding the hour, the defendant's mother willingly allowed the officers into her home, both in an effort to cooperate and in the belief that her son had been in his room all night. He further found that the defendant voluntarily gave his sneakers to the officers and that when they returned from the VFW Post, they advised the defendant of his rights, placed him under arrest, and seized the evidence in plain view in the defendant's room. These findings are supported by the evidence.