COMMONWEALTH vs. DAVID BALDWIN.

Middlesex. December 3, 1980. — February 17, 1981.

Present: HALE, C.J., CUTTER, & ARMSTRONG, JJ.

*Search and Seizure. Probable Cause. Constitutional Law*, Search and seizure.

Where a police officer had received information that stolen automobiles of a certain make would be delivered to the defendant, who operated a licensed automobile repair shop and second-hand automobile business, within a month and subsequently observed an automobile of that make near the edge of the shop's unfenced parking area, the officer's entry on the premises to look at the vehicle and to copy the vehicle identification number which was visible through the windshield did not constitute an illegal search. [390-391]

An affidavit in support of an application for a search warrant which stated that a police officer had received information from a reliable informant whose information had proved accurate in the past that stolen automobiles of a certain make would be delivered to the defendant's business premises, that the officer had observed one such automobile on the premises within a predicted time period, and that the automobile had been stolen some months earlier supported a finding of probable cause to issue a warrant to search the premises. [391-392]

A search warrant authorizing the police to search for "stolen motor vehicles" on premises owned by the defendant sufficiently specified the object of the search. [392-393]

Police officers who had searched the defendant's business premises for stolen motor vehicles and parts on the day a search warrant issued were justified in returning the following day to continue the search. [393]

Police officers who were searching premises on which the defendant operated an automobile repair shop and second-hand automobile business pursuant to a search warrant for "stolen motor vehicles" were permitted by G. L. c. 140, § 66, to examine documents and papers in the shop without an administrative warrant where the employee in charge of the shop made no significant or positive objection to the examination. [393-396]

Police officers who had located, pursuant to a search warrant, several stolen automobiles on premises used for an automobile repair shop and

second-hand automobile business and had examined certain papers and documents of the business pursuant to their authority under G. L. c. 140, § 66, were justified in obtaining a further warrant to take into custody all the records relating to the business. [396-397]

INDICTMENTS found and returned in the Superior Court Department on November 28, 1978.

A motion to suppress evidence was heard by *Clancy*, J., a District Court judge sitting under statutory authority.

An application for leave to appeal was allowed in the Supreme Judicial Court for the county of Suffolk by *Liacos*, J., and the appeal was reported by him to the Appeals Court.

*Thomas F. Heffernon* for the defendant.

*Susan C. Mormino*, Assistant District Attorney, for the Commonwealth.

CUTTER, J. Baldwin was indicted in November, 1978, for violations of G. L. c. 266, §§ 27A, 60, and 139; c. 90D, § 32; and c. 274, § 7, on numerous counts alleging offenses in Acton from 1976 to 1978 in connection with stolen motor vehicles. Baldwin did business in Acton as "Dave's Bug Shop" (the Shop), which was a licensed automobile repair shop and second-hand automobile business. G. L. c. 140, §§ 58, 59, 66, and 67.[1] The license restricts the licensee to having only four automobiles for display for sale at any one time.

Baldwin's counsel filed a motion to suppress certain evidence. This was denied after hearing by a motion judge,

---

[1] General Laws, c. 140, § 66, as amended through St. 1970, c. 710, reads: "The commissioner of public safety, . . . the police commissioner in Boston, the chief of police of any other city, *the selectmen of a town or any police officer authorized by any of said officials*, . . . may at any time enter upon any premises used by any person licensed under section fifty-nine for the purpose of carrying on his licensed business, ascertain how he conducts the same, and examine all second hand motor vehicles or parts thereof kept or stored in or upon the premises, and all books, papers and inventories relating thereto" (emphasis supplied). Section 67 makes it a criminal offense, punishable by fine or imprisonment for one year (or both) to refuse to admit an officer making a search under § 66, or to hinder or prevent such an examination, or to refuse to exhibit vehicles and material relating thereto.

who made findings (warranted by evidence of the facts stated below) and rulings. Baldwin's application for interlocutory review was granted by a single justice of the Supreme Judicial Court. It has been referred to a panel of this court for decision.

On August 3, 1978, Officer Dennis Thompson of the Acton police department received information from an unnamed informant, who had previously supplied information which had led to success in prosecuting individuals involved with stolen property. In a conversation lasting only a few minutes, the informant told the officer that Dave's Bug Shop on Railroad Street in Acton had "been dealing in stolen motor vehicles," and that stolen Chevrolet Monte Carlos would be delivered to the Shop within a month to be dismantled and the parts sold. The Shop conducted largely a Volkswagen repair and used car business, but also sold automobiles, which was the reason Baldwin had automobiles on display. People walk onto the lot to look at the vehicles on display.

On Sunday, August 20, 1978, about 9:45 A.M., Officer Thompson traveled down Railroad Street past the Shop. He noticed a 1973 Monte Carlo near the edge of the Shop's parking area, two feet from the road and at a level about a foot above the road. About fifteen vehicles (not merely four) were on the lot, mostly Volkswagens. Only two were full-size American-made models. Some automobiles were there for repairs. Three were displayed for sale. The Shop was not open for business that morning. Officer Thompson left his cruiser to look at the Monte Carlo, which had been freshly painted within two weeks. Between August 3 and August 20, he had cruised the area on two or three occasions and had not seen the Monte Carlo there before. It bore no license plates, its ignition was intact, and the keys were not in the vehicle as seen through the window. He viewed through the windshield the vehicle identification number (VIN) on the dashboard and copied it. He then called the VIN into the police station and, upon "a stolen [computer] check," the report came back, after a few minutes, that the

vehicle had been stolen in Worcester in September, 1977. He consulted with the duty officer, Sergeant McNiff, and with him proceeded to obtain a warrant. His affidavit contained most of the circumstances summarized above.[2] On the strength of this affidavit a warrant issued to search the "1973 Monte Carlo VIN # 1H53H 3146 7611, a two story building cement block first floor and wooden second floor . . . . Also a trailer attached to the . . . building, painted silver . . ." and to look for the Monte Carlo, keys for that "vehicle and any other stolen motor vehicles or parts therein, [and] registration plates # 8H429 for the above . . . vehicle."

Officer Thompson returned about 1:30 P.M., to the Shop. The police broke a window and unlocked the door. Soon Baldwin (who had been called by the Acton police) arrived, was given Miranda warnings, and was arrested. He gave the officer the keys to the Monte Carlo. A tag attached to the keys, bore the VIN of a second Monte Carlo, a wreck standing near the building. The policemen, for about forty-five minutes, examined and recorded VIN's appearing on all the vehicles. One Datsun had two different VIN's. An initial computer check reported no one of the other automobiles as stolen.

The next morning, Officer Thompson discovered that the initial computer check had been made incorrectly. A fur-

[2] "[O]n August 3, 1978 at approx. 2:45 P.M. I received information from a reliable informant that a business operated under the name of Daves Bug Shop 5 Railroad St Acton has been dealing in stolen motor vehicles. This informant further stated to me that within a month that stolen Cheve Monte Carlos would be delivered to that address. These vehicles would be disma[n]tled and the parts from same would be sold. This informant on at least two different occasions has provided me with information which has resulted in the arrest and conviction of persons involved with stolen property. On this date August 20, 1978 at 9:45 AM I checked a 1973 Cheve Monte Carlo parked at the southeast corner of the parking lot at Daves Bug Shop 5 Railroad St Acton. This vehicle VIN. 1H57h31467611 was reported stolen to the Worcester Police Dept. on 10-15-77 by a Edward Rafferty . . . The ignition switch was still intact, and the vehicle doesn't appear to be hot wired. It is my belief that the key to the above described vehicle is located inside the garage known as Daves Bug Shop located at 5 Railroad St Acton."

ther computer check on one red Volkswagen resulted in a report that it had been stolen. The officers returned to the Shop at 9:30 A.M. (on August 21), and found that the red Volkswagen was missing. Two employees of the Shop gave the officers the somewhat improbable explanation that the red Volkswagen must have been stolen during the night. The officers at some time showed the employees a copy of G. L. c. 140, § 66 (note 1, *supra*). They also conducted a check of certain vehicles, the VIN's of which were at places other than the dashboard. The officers also looked at automobile parts and at business papers, car titles, bills of sale, and other documents stored in a file cabinet. As a result of a continued computer check, other vehicles, as they were reported "stolen," were impounded. One of the officers, Inspector Dupont, left the Shop about 1:30 P.M. (on the 21st) to obtain a new warrant. Documents and papers were taken into police custody under this warrant, which referred to all "records, [b]ooks, papers and inventories relating to" the Shop.

1. Baldwin, through counsel, contends that the initial entry a few feet onto the Shop's premises, to look at the newly painted Monte Carlo vehicle, constituted an illegal search. We disagree. Officer Thompson was entering unfenced commercial premises on which vehicles were displayed for sale and to which the public had reasonable access. In view of the informant's earlier report that, within a month, stolen Monte Carlo vehicles would be sent to the Shop, Officer Thompson would have done less than his duty if he had not made an initial, peaceful inspection of the Monte Carlo vehicle in plain sight to see what could be discovered. In addition to the implied invitation to all members of the public to enter reasonably on the area, at least to inspect vehicles displayed for sale, the statutory authorization contained in G. L. c. 140, § 66, purported to give authority for stated authorized persons to "enter upon any premises" used by a licensee to carry on his business under § 59. See *Commonwealth* v. *Murphy*, 353 Mass. 433, 435-439 (1968); *Commonwealth* v. *Colella*, 360 Mass. 144,

147-151 (1971). If there was a search at all when Officer Thompson looked through the windows of the vehicle (at the VIN in plain view) without opening any part of the vehicle (see *Commonwealth* v. *Dolan*, 352 Mass. 432, 433 [1967]), what was done was reasonable, and in no sense such an intrusion as would require obtaining an administrative warrant (not mentioned or required by any language in § 66; see, however, *Commonwealth* v. *Accaputo*, 380 Mass. 435, 442 [1980]). There could be no reasonable expectation of privacy on Baldwin's part, preventing examination, through its windows, of a vehicle placed within a few feet of a public street. See *Commonwealth* v. *Small*, 10 Mass. App. Ct. 606, 610-611 (1980). See also *Commonwealth* v. *Navarro*, 2 Mass. App. Ct. 214, 216-222 (1974).

It has not been contended that any signs prohibited entrance upon the areas adjacent to the Shop or that the Shop and its sub-buildings were used at all as a dwelling or for residential purposes. Cf. *Commonwealth* v. *Hall*, 366 Mass. 790, 794 (1975). If the theory of protection of a curtilage (see *Rosencranz* v. *United States*, 356 F.2d 310, 313 [1st Cir. 1965]; *Wattenburg* v. *United States*, 388 F.2d 853, 857-858 [9th Cir. 1968]) applies at all to business (as distinguished from residential) property, we are of opinion that it cannot reasonably be significant in an open, unfenced, area where public inspection is impliedly permitted and probably invited. See *Commonwealth* v. *Laudate*, 345 Mass. 169, 171 (1962); *United States* v. *Conner*, 478 F.2d 1320, 1323 (7th Cir. 1973). In such open areas one may not reasonably expect privacy. See *Air Pollution Variance Bd.* v. *Western Alfalfa Corp.*, 416 U.S. 861, 864-866 (1974); *United States* v. *Freie*, 545 F.2d 1217, 1223 (9th Cir. 1976). See also *Commonwealth* v. *Frazer*, 10 Mass. App. Ct. 429, 432 (1980); *United States* v. *Jackson*, 585 F.2d 653, 656, 659-660 (4th Cir. 1978).

2. The affidavit (note 2, *supra*) upon which the first search warrant was issued on August 20 was sufficient. The affidavit (1) not only gave support to the informant's relia-

bility in that it stated that the informant's assistance had proved accurate in other instances, but (2) also it gave adequate assurance (by its allegation that a stolen Monte Carlo was at the Shop) that the informant's prediction was based on much more than conjecture. The informant's report was somewhat meager, perhaps because of fear of detection and reprisal. Any inadequacies of his report, however, were cured when a stolen vehicle of the predicted type was found at the Shop within the predicted time period. We hold that, based upon a "common-sense" reading of the entire affidavit (see *United States* v. *Ventresca,* 380 U.S. 102, 108 [1965]), the affidavit provided (by the presence of the stolen Monte Carlo) the "needed . . . further support" for the informant's report. See *Spinelli* v. *United States,* 393 U.S. 410, 418 (1969). See also the cases on corroboration by police investigation of an informant's tip, collected in *Commonwealth* v. *Kaufman,* 381 Mass. 301, 303-304 (1980). In the present case, the corroboration was more than adequate. *Draper* v. *United States,* 358 U.S. 307, 312-314 (1959). See *Commonwealth* v. *Avery,* 365 Mass. 59, 62-65 (1974).

3. The warrant issued on Sunday, August 20, sufficiently specified the items to be the subject of search. In the circumstances, "stolen motor vehicles" was an adequately definite term to describe the object of the search (as was shown by the prompt identification of the stolen vehicles by the computer checks made in this case). There seems to be no contention that the Acton police force did more with respect to any vehicle than to check their VIN's until these vehicles severally were reported as "stolen" by computer check. See *Commonwealth* v. *Mascolo,* 6 Mass. App. Ct. 266, 270-271, *S.C.,* 375 Mass. 789, cert. denied, 439 U.S. 899 (1978). Any discretion to the officers, given by the warrant with respect to vehicles, was adequately limited by the word "stolen." See *Commonwealth* v. *Cefalo,* 381 Mass. 319, 324-332 (1980); *Commonwealth* v. *Kenneally,* 10 Mass. App. Ct. 162, 174-175 (1980), further app. rev. granted, 381 Mass. 781 (1980). See also *United States* v. *Cortellesso,* 601 F.2d 28, 30-32 (1st Cir. 1979), cert. denied, 444 U.S. 1072

(1980). Nothing unrelated to the possible presence of stolen vehicles or parts was examined or taken into custody on August 20. Cf. *Commonwealth* v. *Hawkins*, 361 Mass. 384 (1972).

4. The conduct of the police on the morning of Monday, August 21, was reasonable. It may be viewed, in whole or in part, either as a further search pursuant to the warrant issued on Sunday, the 20th, or as an administrative examination under G. L. c. 140, § 66.

It was proper for the police (especially when they discovered that the computer check on Sunday had not been made properly) to return to complete on a business day their search under the outstanding warrant. See discussion in *Commonwealth* v. *Cromer*, 365 Mass. 519, 522-525 (1974). The necessity of their doing so had been emphasized by their discovery (a) that the red Volkswagen seen at the Shop on Sunday had turned out to be a stolen vehicle, and (b) that it had disappeared, and had been moved overnight. Vehicles behind it on Sunday had also been moved.

Although, as the officers frankly admitted (and as the motion judge found), they were still pursuing one step in a criminal investigation, they were also acting in aid of one of the obvious regulatory purposes of G. L. c. 140, §§ 57 to 69, viz. the control (for the protection of the public from fraud and thefts) of traffic in stolen motor vehicles.

The record shows no objection[3] to the Monday morning search (other than a request "to know what gave . . . the right") by the employees then working at the Shop, either to

---

[3] Baldwin himself testified (a) that on Sunday he had not consented to the search of the premises and that all the employees who could give consent were with him (in Fitchburg) on that Sunday, and (b) that he himself was not at the Shop on the 21st or for two weeks thereafter. He said that he had approached the Shop on the 21st but had seen police cars there. Mrs. Baldwin testified that one of Baldwin's employees, Tat Trombetta, had "waved [them] off" on the 21st when they came near the Shop. Inspector Dupont, who had not been present on August 20, when Baldwin was arrested, testified that he spoke to Baldwin on the 21st. He may well have assumed that Trombetta, or some other man apparently in charge of the Shop, was Baldwin.

Commonwealth *v.* Baldwin.

continuing the search or to the officers' proposed inspection under G. L. c. 140, § 66. Of this statute the employees were given a copy.

The new computer check on the morning of the 21st went on during a "three or four hour stretch of time." The officers would communicate with the police station by radio or by telephone and obtain information about "the outcome of the computer read-out."

To the extent that the search on August 21 of the Shop's premises was confined to a search for stolen vehicles and parts, the search was justified by the warrant issued on the 20th. This warrant also justified ascertaining that enclosed file cases and boxes did not contain parts. For the more detailed examination of papers, G. L. c. 140, § 66, provided support and was relied on by the officers who talked on the 21st with the employees then present at the Shop about the provisions of § 66. The officers did not obtain an administrative warrant. This may have been because § 66 makes no mention of such a warrant and because the *Accaputo* case, 380 Mass. 435 (1980), had not yet been decided. Compare, in this respect, the express provisions of G. L. c. 94C, § 30, as amended through St. 1972, c. 806, § 21, the provision considered in the *Accaputo* case. Section 30 lays down in explicit form various procedural requirements which must be satisfied.

In the *Accaputo* case, an administrative warrant had been obtained before a search was made, so no occasion arose for the court then to consider what would have been the consequence of acquiescence by the owner of the searched premises in an inspection without a warrant under c. 94C, § 30. It was suggested in that case (at 439) that § 30 did not "authorize warrantless inspections, absent consent or exigent circumstances described by § 30(g)," and that the express requirement in § 30 of an administrative warrant in effect precluded consideration of the question whether a pharmacy was such "a pervasively regulated business, in regard to which a warrantless inspection is constitutionally permissible."[4]

---

[4] Such "pervasively regulated" businesses include the liquor business, *Colonnade Catering Corp.* v. *United States,* 397 U.S. 72, 77 (1970), and

The *Accaputo* opinion greatly relied on *Marshall* v. *Barlow's, Inc.*, 436 U.S. 307 (1978), which dealt with the requirements of an administrative inspection under the Occupational Safety and Health Act of 1970. 29 U.S.C. § 657(a) (1976). In that case, the owner of the premises to be searched refused to permit a warrantless search (310). In the present case, there was no evidence of express and affirmative consent (see note 4, *supra*) to the search but also (as has been noted above) it was not shown that the employee in charge of the Shop made any significant or positive objection to the search or examination of records (at least some of which were required to be kept by G. L. c. 140, § 62). See the discussion in *United States* v. *Miller*, 589 F.2d 1117, 1130-1132 (1st Cir. 1978), cert. denied, 440 U.S. 958 (1979), of situations in which consent may be implied. In *Marshall* v. *Barlow's, Inc.*, *supra* at 316,[5] the Court stated that "the great majority of businessmen can be expected in normal course to consent to inspection without warrant." We think that, in the present case, it should have been clear to the employees in charge of the Shop that the police officers were relying in part on c. 140, § 66, as authority for their search. The employees have not been shown to have given the officers (so far as the record reveals) ground for any belief that there was not consent to and acquiescence in the search. In

---

dealing in firearms, *United States* v. *Biswell*, 406 U.S. 311, 315-317 (1972). Cf. *See* v. *Seattle*, 387 U.S. 541, 545-546 (1967), dealing with a fire safety search. In view of the possibility that the sale of used automobiles may be employed to conceal a traffic in stolen vehicles, the intensive regulation of the sale of second-hand vehicles, authorized in G. L. c. 140, §§ 59-69, inclusive, appropriately should be held to be another such business. That the Acton police had not previously looked at Baldwin's records indicates merely lax enforcement of the statute, not that it does not provide pervasive regulation, where required.

[5] In the *Marshall* case, at 321, the Supreme Court opinion also recognized that statutes outside the areas dealt with in the *Colonnade* and *Biswell* decisions might "apply only to a single industry, where regulations might already be so pervasive that . . . [an] exception to the warrant requirement could apply." See, as to this, *Boston* v. *Ditson*, 4 Mass. App. Ct. 323, 328-329, *S.C.* 370 Mass. 867 (1976), appeal dismissed, 429 U.S. 1057 (1977).

such circumstances, it is reasonable to expect specific protest, sufficient to put searching officers on notice that further authority for their search (by obtaining a search warrant or an administrative warrant) is requested.

In any event, at some stage, on August 21, it became apparent from the computer checks of VIN's of vehicles on the Shop premises and in an open area nearby, that there were several stolen vehicles and one stolen engine on the premises of the Shop. There had been an examination of papers during the earlier part of the day and the officers, or one of them, decided that if they "had a search warrant it would be easier to finish going over the paperwork instead of holding up the people at the [S]hop." Although the officers might well have decided earlier on the 21st that they should seek further authority, they are not denied by G. L. c. 140, § 66, a reasonable time in which to reach that conclusion. See *Commonwealth* v. *Bond,* 375 Mass. 201, 206 (1978). Inspector Dupont obtained a further warrant. He supplemented the affidavit made by Officer Thompson on the 20th by an addition to the affidavit which disclosed that three stolen vehicles (in addition to the stolen 1973 Monte Carlo mentioned by Officer Thompson) had been found at or near the Shop.

This affidavit provided probable cause to believe that Baldwin was engaged in a general pervasive scheme of dealing in stolen vehicles at the Shop. Indeed, at least a quarter of the vehicles at the Shop had been reported as stolen. There thus was ground for issuing a broad warrant to take into custody all the records of this small business based upon the belief, stated in the affidavit, that "the records will contain information relating to other stolen [m]otor [v]ehicles and to there [sic] whereabouts." The situation, on a much smaller case, is much like the "pervasive scheme" considered in *United States* v. *Brien,* 617 F.2d 299, 305-309 (1st Cir.), cert. denied, 446 U.S. 919 (1980). It does not appear that any papers were taken from the Shop until the second warrant was issued. The disappearance, after Baldwin's arrest on the 20th, of the stolen red Volkswagen (already men-

tioned) provided the officers with grounds for apprehension that records not taken might soon disappear. Their effort, once they knew of the broader presence of stolen vehicles at or near the Shop, to obtain authority to collect and safeguard the records, was well justified.[6]

*Order denying the motion to*
*suppress affirmed.*

---

[6] The affidavits of August 20 and 21 appear to have been attached to the warrants issued on those days, respectively.