UNITED STATES of America,
Plaintiff-Appellee,

v.

Parnell BOWLING, Defendant-Appellant.

No. 16226.

United States Court of Appeals
Sixth Circuit.

Sept. 29, 1965.

Charles J. Schear, Newport, Ky. (Morris Weintraub, Newport, Ky., on the brief), for appellant.

James F. Cook, Asst. U. S. Atty., Lexington, Ky., (George I. Cline, U. S. Atty., Lexington, Ky., on the brief), for appellee.

Before CECIL,* PHILLIPS and EDWARDS, Circuit Judges.

* Lester L. Cecil became a Senior Circuit Judge on August 1, 1965.

EDWARDS, Circuit Judge.

The Fourth Amendment prohibits "unreasonable searches and seizures." It also specifically allows for searches and seizures upon "probable cause" and the issuance of a judicial warrant. In such cases as Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933 (1961); Aquilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); Stoner v. State of California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) and Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964), the Supreme Court of the United States has spelled out its desire to encourage the use of search warrants wherever it was reasonably possible for the police to procure one.

The Supreme Court has also made clear that highly technical attacks upon affidavits and warrants where sought and used are not to be encouraged.

"These decisions reflect the recognition that the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." United States v. Ventresca, supra, 380 U.S. at 108, 85 S.Ct. at 746.

Herein, with ample reason to believe that defendant was operating as a fence for stolen business machines, the police officer concerned went to two courts to procure three different search warrants in order to search—more or less simultaneously—the three logical storage places which they knew defendant to possess. In two of the places searched, the searchers drew blanks. In the third, defendant's home, the searchers discovered a basement full of stolen property—including the business machines herein concerned.

Two of these machines had been stolen from agencies of the United States government. Their recovery resulted in the instant indictment under which defendant was charged with unlawfully and willfully receiving and concealing property of the United States, with intent to convert it to his own use in violation of Title 18 U.S.C. § 641.

Defendant was tried by a jury. A motion to suppress evidence was made and denied. Defendant was found guilty and sentenced to one year and one day on each count, with the sentences to run concurrently.

The sole issue on this appeal pertains to the District Judge's denial of the motion to suppress evidence. That motion was filed before trial and was the subject of extensive evidence before the District Judge. It was lengthy and technical and was amended on the day of hearing. The issues as presented to the District Judge may be summarized as follows:

1. The search warrant as issued was fatally defective because issued without "basis of fact" and as a "fishing expedition" or "flyer."

2. That it was fatally defective as too indefinite and vague as to the objects of the search.

3. That the evidence seized and sought to be introduced was not seized under the search warrant at all because the search warrant had been "returned" prior to the seizure.

4. That the search was illegal because not conducted by the officers specifically authorized to conduct it.

The facts as developed at hearing present an interesting story. A Cincinnati Police Department detective, Lt. Scully, having been told of theft of an IBM typewriter on which a "ball" was missing, advised the IBM "people," "in the event anybody orders this particular ball, have one of your salesmen check the item and get the serial number off of it, because it might be one of the stolen pieces of equipment."

Subsequently, a businessman in Fort Thomas, Kentucky, did order a "ball" and the IBM people did notify Lt. Scully, and on checking the serial numbers of this machine, he ascertained that it was the one previously reported stolen. Asked where he got the stolen machine, the Fort Thomas businessman reported he got it from a W. A. Hennard of Newport, Kentucky.

The story continues from the transcript:

"Q Tell us what happened when you got to Hennard's place of business.

"A When we entered Hennard's place of business, I asked him about this IBM machine and he stated that he had sent it up there on memorandum and I asked him where he purchased it. He said a fellow in an old gray station wagon had brought it in and sold it to him. I asked him who the man was; he said he didn't know. While I was there, I observed a piece of equipment that was stolen in Cincinnati on Curtis Street.

"Q Now, this is a second piece of equipment?

"A This is a second piece of equipment that did not come from the I.B.M. people.

"Q. Were you able to identify that second piece of equipment?

"A I had the serial number of that piece of equipment in my pocket at that time.

"Q. Along with other numbers that you also had with you?

"A That is right.

"Q All right, did you face Hennard with this information?

"A I did.

"Q And where did he tell you that he got that piece of equipment?

"A Got it from the same man that had the old gray station wagon.

"Q Did he ever change his story and tell you where he got this piece of machinery?

"A Not that day, he did not.

"Q And when did he tell you?

"A The next day.

"Q Was that on April the second of this year?

"A That's correct.

"Q When did he tell you that day?

"A On the second?

"Q Yes.

"A Told me he had gotten it from Parnell Bowling, along with other numerous pieces of office equipment.

"Q How long did he indicate he had been dealing with Parnell Bowling for office equipment?

"A I can't answer that question.

"Q Did he indicate he had a sizeable account with him?

"A Yes, he did.

"Q Did he indicate whether or not Parnell Bowling still had, to his knowledge, other business machines and equipment?

"A He did, sir.

*     *     *     *     *     *

"Q Did he indicate whether or not he had a sizeable account with Parnell Bowling?

"A He did.

"Q Did he indicate that he had dealt in some volume with him?

"A He stated that this home that was under construction had new sinks and new equipment that would go into a home and that he had traded the equipment to renovate

this building for this office equipment.

"Q Did he indicate that he had actually seen office equipment on the premises of Parnell Bowling?

"MR. WEINTRAUB: I want to object to that, if Your Honor please, on this basis: What premises of Parnell Bowling?

"MR. BROOKS: On any premises of Parnell Bowling.

"A Yes, he did.

"Q What premises?

"A The drug store at Eighth and Central.

"Q Did he tell you whereabout in the store he saw—

"A Yes, he did. He said it was in the rear of the store where he filled the prescriptions on a range or a stove or something back there.

"Q Now, on that same day did you obtain a search warrant for the drug store of Parnell Bowling?

"A I did.

"Q Did you obtain it on the basis of that information?

"A I did.

"Q You also obtained one for a building—

"MR. WEINTRAUB: If Your Honor please, again I want to object to that. I want to object because I introduced the affidavit for the search warrant that was issued for the drug store and the empty building and that speaks for itself, if Your Honor please.

"MR. BROOKS: I assume that you did. It has already been shown that you did.

"A Yes, sir.

"Q Now, when you obtained these search warrants, did you obtain these warrants on the basis of the information given you by W. A. Hennard?

"A I did."

Actually Lt. Scully proceeded to procure three search warrants—one for the Bowling drug store, one for the building into which the drug store was about to move, and one for Bowling's home. The affidavit and the warrant issued for the home recited as follows:

### "AFFIDAVIT FOR SEARCH WARRANT

"Affiant, Richard Scully, being first duly cautioned and sworn states that the laws of the Commonwealth of Kentucky, which prohibit receiving and possessing stolen property are being violated by Parnell Bowling at his residence known and designated as Box 146 F, Johns Hill Road, Cold Spring, Kentucky, which consists of a one (1) story red wire cut brick building; that affiant's reasons for stating the laws are being violated are that affiant was informed on this date by W. A. Hennard, who is in custody, that the following stolen articles are in the possession of the said Parnell Bowling and are located in the residence described herein at the present time:

"1 Victor Adding Machine, Serial No. 1635–392

"1 IBM Electric Typewriter, Serial No. 1261503

"1 Underwood Electric Typewriter, Serial No. E–13–8753824

"1 IBM Electric Typewriter, Serial No. 1186204

"1 Royal manual typewriter, Serial No. 6409538

and other stolen property, are in the premises of the said Parnell Bowling and are being concealed in the premises occupied by the said Parnell Bowling, which said premises are more particularly described as follows:

"A one (1) story red wire cut brick building located at Box 146 F, Johns Hill Road, Cold Spring, Kentucky.

"Affiant further states that the conduct described herein which occurred in and on the premises described herein are in violation of

**240**

the laws of Kentucky and contrary to the peace and dignity of the Commonwealth of Kentucky.

"/s/ RICHARD SCULLY

"Subscribed and sworn to before me, Notary Public, this 2nd day of April, 1963.

"/s/ BETTE L. RIEDMATTER

"My Comm. expires: 3/14/64

"A. J. JOLLY, Judge"

"SEARCH WARRANT

"COMMONWEALTH OF KENTUCKY

"To the Chief of Police of the County Police or to the Sheriff of Campbell County, Kentucky, or his Deputies or any other Campbell County Officer:

"Affiant, Richard Scully, having filed with me an affidavit stating that the laws of the Commonwealth of Kentucky which prohibit receiving and possessing stolen property is being violated by Parnell Bowling in and about the premises known and described as his residence located Box 146 F, Johns Hill Road, Cold Spring, Kentucky and being described as a one (1) story red wire cut brick building.

"THEREFORE, you are ordered and directed to search the above described premises by day or night for the detection of and seizure of stolen articles mentioned in the affidavit hereto attached, and if admission be not given on demand, to force an entrance into said premises for the detection of and seizure of said stolen articles and arrest the keepers or others in charge of said premises and other law violators, and bring him and them before me to be dealt with according to law.

"Dated: April 2, 1963.

"Time: 4:30 P.M.

"/s/ A. J. JOLLY

Judge, Campbell County, Kentucky

"4-2-63

"Executed this warrant at 6:15 P.M. by searching above premises for articles believed stolen in Greater Cincinnati area.

"/s/ LT. G. ARNOLD"

With this warrant in their possession, Newport and Campbell County police went to defendant's home, arriving there at 6:15 p. m. on April 2, 1963. Lt. Scully arrived later:

"Q About what time did you go there?

"A About seven P.M.

"Q How long did you stay there?

"A Close to midnight.

"Q What were you doing there at that time?

"A Writing serial numbers of various items in the basement of his home.

"Q Can you estimate at this time the number of items there in the home?

"A Fifty.

"Q Fifty items. Did it take considerable time to find the serial numbers on some of this equipment?

"A Yes, sir.

"Q During the time that you were there were you engaged primarily, not entirely, in the recording and looking for these serial numbers?

"A Yes, sir.

"Q This equipment there, Lt. Scully, was this—bulky, taken together?

"A Yes, sir."

None of the machines were seized that night except for a two-way radio which one of the officers recognized as having been stolen from a construction company. But the serial numbers were checked overnight, and on discovering that numbers of them (including those on the two machines involved in this indictment) were on police lists of stolen equipment, Newport and Campbell County police officers returned with a truck the next morning and seized and removed the material in the basement.

Lt. George Arnold, of the Newport Police, had entered a notation on the war-

rant indicating service at 6:15 p. m. on April 2 (see warrant above). Lt. Arnold also testified that he returned the warrant to court on April 10, 1963—the date the case was set for.

On this record we have no hesitancy in agreeing with the District Judge as to those issues which were squarely presented to him and decided by him on the motion to suppress.

■ The affidavit on its face recited ample reason for the magistrate to issue the search warrant. And as we read the search warrant, it appears quite specific in relation to the place and object of the search. Cf. Aquilar v. State of Texas, supra.

■ The service of the warrant appears to have conformed to Kentucky law, and, although not made by federal officers, appears likewise to be in general conformity to Rule 41 of the Federal Rules of Criminal Procedure.

■ The point earnestly urged that the actual seizure on the morning of April 3 was not made under the warrant at all because it had been "returned" at 6:15 April 2 seems to us to be an obvious misconstruction of the word "return." There was evidence (and uncontradicted) from which the District Judge could have concluded that the warrant was "returned" April 10. And certainly the mere fact that the time of its first use was promptly noted thereon did not vitiate its powers as of the following morning.

The more formidable problem posed by this case, however, is one which apparently was never specifically raised before the District Judge.

On appeal by brief and argument, appellant contends through his counsel that erroneous representations in the affidavit were knowingly, falsely and fraudulently made by Lt. Scully and that this fraud was so material as to destroy the integrity of the affidavit (Cf. Rugendorf v. United States, 376 U.S. 528, 532.

84 S.Ct. 825, 11 L.Ed.2d 887 (1964)) and "vitiate the warrant and the search" (Cf. King v. United States, 282 F.2d 398 (C.A. 4, 1960)).

This record shows that there were erroneous representations made in the affidavit upon which the search warrant for the house was issued. But the contention that these errors were of such magnitude and based on such a fraudulent purpose as to vitiate the warrant was never presented to the District Judge either by the motion to suppress or the amendment thereto, or at the hearing thereon, or for that matter, on motion for new trial after conviction. And, of course, since the charge of intent to deceive the issuing magistrate was not made, the record is barren of any answers which the charge might have produced.

■■ Generally, we do not reverse on issues not shown to have been specifically presented to the court below. United States v. Doelker, 327 F.2d 343 (C.A. 6, 1964); Holt v. United States, 303 F.2d 791, 794 (C.A. 8, 1962), cert. denied, 372 U.S. 970, 83 S.Ct. 1095, 10 L.Ed.2d 132 (1963). And while we are aware of the "plain error" rule, Rule 52(b), Fed. R.Crim.P.,[1] we believe its application under the circumstances of this case is discretionary. Gendron v. United States, 295 F.2d 897, 902 (C.A. 8, 1961); United States v. Sferas, 210 F.2d 69 (C.A. 7, 1954), cert. denied, 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086 (1954); United States v. Diggs, 304 F.2d 929 (C.A. 6, 1962).

■ While we have noted that the intent to deceive the magistrate charge was never presented to the District Judge, he did have clearly before him the factual errors in the affidavit upon which appellant now relies. Under this circumstance, we read the denial of the motion to suppress evidence as a holding that there was probable cause for the warrant and that errors in the affidavit were

---

1. Rule 52(b), Federal Rules of Criminal Procedure. Plain errors or defects affecting substantial rights may be notice'l

although they were not brought to the attention of the court.

either immaterial or unintentional,[2] such as are produced by drafting "by non-lawyers in the midst and haste of a criminal investigation." United States v. Ventresca, supra, 380 U.S. at 108, 85 S.Ct. at 746.

We find no reversible error.

Affirmed.

2. Generally, where probable cause to issue the warrant has been found, the courts have not looked favorably on attacks on search warrants which are based on claims of falsity in the statements of the affidavit. United States v. Ramirez, 279 F.2d 712 (C.A.2, 1960), cert. denied, 364 U.S. 850, 81 S.Ct. 95, 5 L.Ed.2d 74 (1960); United States v. McKay, 2 F.2d 257 (D.C.Nev., 1924); United States v. Evans, 97 F.Supp. 95 (E.D.Tenn., 1951); United States v. Doe, 19 F.R.D. 1 (E.D. Tenn., 1956); United States v. Brunett, 53 F.2d 219 (W.D.Mo., 1931); Annot., 5 A.L.R.2d 394 (1949); Cf. King v. United States, 282 F.2d 398 (C.A.4, 1960); United States v. Henderson, 17 F.R.D. 1 (D.C.D.C., 1954); United States v. Bell, 17 F.R.D. 13 (D.C.D.C., 1955), aff'd. sub nom. Woods v. United States, 99 U.S.App.D.C. 351, 240 F.2d 37 (1956), cert. denied, 353 U.S. 941, 77 S. Ct. 815, 1 L.Ed.2d 760 (1957); United States v. Nagle, 34 F.2d 952 (N.D.N.Y., 1929); Atlanta Enterprises v. Crawford, 22 F.2d 834 (N.D.Ga., 1927).

Dealing squarely with such a claim of falsity in an affidavit, the Supreme Court of the United States said:

"Petitioner attacks the validity of the search warrant. This Court has never passed directly on the extent to which a court may permit such examination when the search warrant is valid on its face and when the allegations of the underlying affidavit establish 'probable cause'; * * *." Rugendorf v. United States, 376 U.S. 528, 531–532, 84 S.Ct. 825, 828 (1964).

The facts in our instant case do not lend themselves to a present expression on this controversy.