Robert D. WOOD, Appellant,

v.

STATE of Alaska, Appellee.

No. A-3537.

Court of Appeals of Alaska.

Aug. 14, 1992.

Larry Cohn, Anchorage, for appellant.

Jill De La Hunt, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and ANDREWS and FABE, Superior Court Judges.*

## OPINION

BRYNER, Chief Judge.

After a jury trial presided over by Superior Court Judge Joan M. Katz, Robert D. Wood was convicted of six counts of sexual abuse of a minor in the second degree. Wood appeals, contending that Judge Katz erred in restricting his cross-examination of the alleged victim, in refusing to suppress certain items of evidence resulting from the execution of a search warrant that failed to describe the objects to be seized with adequate particularity, and in failing to declare a mistrial due to various discovery violations. We reverse.

## PROCEDURAL BACKGROUND

Wood's convictions stem from incidents of sexual abuse—primarily mutual masturbation—alleged to have occurred between June of 1987 and June of 1988. The incidents purportedly involved Q.C., a boy who was then twelve to thirteen years old. The alleged sexual abuse of Q.C. came to light in November and December of 1988 as a result of an investigation by the Alaska State Troopers into an unrelated incident involving Wood's solicitation of another minor for purposes of engaging in sexual acts.[1] In the course of that investigation, a neighbor of Wood identified Q.C. to the troopers as a child who had previously associated with Wood. When questioned by the troopers, Wood acknowledged that Q.C. had frequently visited and stayed with him, but Wood denied any sexual involvement with Q.C.

After receiving this information, Trooper James D. Farrell interviewed Q.C. on December 16, 1988, to determine if the boy had been a victim of molestation by Wood. Q.C. initially denied any molestation. Farrell, however, persisted. Using a technique he later described as "bluffing," Farrell urged Q.C. to "go ahead and tell us because we already know and we want to get your side of the story." In response, Q.C. acknowledged that Wood had molested him. During the balance of the December 16 interview, and in later interviews on December 19 and 20, Q.C. described an ongoing pattern of sexual contacts by Wood during the latter half of 1987 and the first half of 1988. On March 8, 1989, Q.C. testified before a grand jury, which indicted Wood.

After issuance of the indictment, Wood's counsel evidently learned that Q.C. had,

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

1. In connection with the investigation, Wood separately entered a plea of no contest to a charge of solicitation of sexual abuse of a minor in the third degree. Wood does not challenge his conviction for solicitation in this appeal.

himself, been accused of sexually abusing a minor. On March 8, 1988—during the same period in which Wood was allegedly molesting Q.C.—Alaska State Trooper Ellen Kord had interviewed Q.C. concerning a complaint that Q.C. had had sexual contact with J.P., a seven-year-old girl Q.C. was babysitting. Q.C. admitted molesting J.P. During the same interview, Kord asked Q.C. if he had ever been sexually abused. Q.C. told Kord that, when he was six years old, a cousin had sexually penetrated him; Q.C. also told Kord that a friend of his mother had once attempted to French-kiss him. Q.C. expressly denied any other sexual abuse. After Kord's March 8, 1988, interview, the troopers had referred Q.C.'s case to juvenile authorities for possible delinquency proceedings. In May of 1988, Q.C. had apparently entered into a "conduct agreement"—essentially a form of deferred prosecution whereby the state agreed to hold delinquency proceedings in abeyance for a one-year period, and ultimately to forego formal charges, provided that Q.C. remained on good behavior in the interim.

After learning about Kord's March 8 interview with Q.C., Wood requested the trial court to allow him to cross-examine Q.C. concerning the charge that he had sexually abused J.P. Among several grounds for this request, Wood expressly asserted that, when Trooper Farrell interviewed Q.C. in December of 1988, Q.C. might have been motivated to fabricate his claims of sexual abuse against Wood. Wood theorized that Q.C. might have wanted to curry favor with Farrell, fearing that if he (Q.C.) did not accuse Wood of molesting him, Farrell might view Q.C. as being uncooperative and might use the lack of cooperation as a basis for terminating the one-year conduct agreement relating to J.P., which was still in effect at the time.

Judge Katz denied Wood's request, finding that the probative value of evidence relating to Q.C.'s involvement in the J.P. incident would be outweighed by the potential prejudice such evidence would create. The judge precluded Wood from any inquiry concerning the conduct agreement resulting from the J.P. incident.[2] Wood challenges this ruling on appeal.

## DISCUSSION

A defendant's right to cross-examination in a criminal case is secured by the confrontation clauses of the United States and Alaska Constitutions. U.S. Const. amend. VI; Alaska Const. art. I, § 11.

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i.e.*, discredit, the witness.

*Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974).

■ The trial court must be particularly solicitous toward cross-examination that is intended to reveal bias, prejudice, or motive to testify falsely. *See Evans v. State*, 550 P.2d 830, 836–37 (Alaska 1976). *See also Hutchings v. State*, 518 P.2d 767 (Alaska 1974); *RLR v. State*, 487 P.2d 27 (Alaska 1971); *Whitton v. State*, 479 P.2d 302 (Alaska 1970). "The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' 3A J. Wigmore, Evidence §. 940 p. 775 (Chadbourn rev. 1970)." *Davis v. Alaska*, 415 U.S. at 316, 94 S.Ct. at 1110.

---

**2.** Judge Katz did allow Wood to impeach Q.C. by establishing, in general terms, that Q.C. had been interviewed by Kord on March 8, 1988, and had denied being sexually abused by anyone other than a cousin and a former friend of his mother's. In addition, after Q.C. testified that he did not know what the word "molesting" meant when Trooper Farrell first interviewed him in December of 1988, Judge Katz permitted Wood to establish that Kord had interviewed Q.C. on March 8, 1988, and that, during the interview, Q.C. had admitted "molesting" the child. The judge instructed the jury, however, that the sole purpose of this evidence was to establish Q.C.'s awareness of the word "molesting" prior to his interview with Farrell.

The opinion of the United States Supreme Court in *Davis v. Alaska* embodies perhaps the most forceful delineation of a defendant's right to cross-examine a prosecution witness to establish bias or motive. Davis was charged with burglary after being identified as the perpetrator by Green, a sixteen-year-old boy who had been adjudicated a delinquent and was on juvenile probation at the time of Davis' offense. During cross-examination, Davis sought to inquire into Green's juvenile record, contending that, because Green was on juvenile probation, his identification of Davis might have been motivated by the desire to curry favor with the state. The trial judge precluded inquiry into the area, relying on an Alaska statute that barred public disclosure of juvenile records. The Alaska Supreme Court upheld Davis' conviction. *Davis v. State*, 499 P.2d 1025 (Alaska 1972).

In reversing the Alaska Supreme Court's decision, the United States Supreme Court emphasized that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis*, 415 U.S. at 316–17, 94 S.Ct. at 1110. The Court found that "the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the witness'] testimony which provided 'a crucial link in the proof ... of [the defendant's] act.'" *Id.* at 317, 94 S.Ct. at 1111 (quoting *Douglas v. Alabama*, 380 U.S. 415, 419, 85 S.Ct. 1074, 1077, 13 L.Ed.2d 934 (1965)). The Court concluded that "[t]he claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of Green's vulnerable status as a probationer." *Davis*, 415 U.S. at 317–18, 94 S.Ct. at 1111.

In weighing the state's interest in protecting the anonymity of juvenile offenders against the defendant's competing interest in exercising the right to cross-examination, the *Davis* court clearly found in favor of the latter:

Serious damage to the strength of the State's case would have been a real pos-

sibility had petitioner been allowed to pursue [the bias] inquiry. In this setting we conclude that the right of confrontation is paramount to the State's policy of protecting a juvenile offender.

. . . .

The State's policy interest in protecting the confidentiality of a juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross-examination for bias in an adverse witness.

*Davis*, 415 U.S. at 319–20, 94 S.Ct. at 1112.

Federal cases have read *Davis* to require "that the fact of adjudication as a delinquent be disclosed along with the fact of probationary status." *Camitsch v. Risley*, 705 F.2d 351, 354 (9th Cir.1983). The rule of *Davis* has been applied in cases involving witnesses who are awaiting trial, *see, e.g., Commonwealth v. Cauto*, 369 Pa.Super. 381, 535 A.2d 602, 606 (1987); on probation, *see, e.g., Davis;* and on parole, *see, e.g., Patterson v. McCarthy*, 581 F.2d 220 (9th Cir.1978). Further, *Davis* has been applied to witnesses facing deferred prosecution. *See, e.g., People v. Peterson*, 633 P.2d 1088, 1091 (Colo.App.1981), *rev'd on other grounds*, 656 P.2d 1301 (Colo.1983). As the court concluded in *McKinzy v. Wainwright*, 719 F.2d 1525, 1529 (11th Cir. 1983): "The rule of *Davis* applies if any facts could be adduced that might suggest to the jury a motive for the juvenile witness to testify favorably for the state." *See also Burr v. Sullivan*, 618 F.2d 583 (9th Cir.1980).

Although *Davis* makes it clear that the trial court "must give due regard to the Sixth Amendment's right of confrontation," *United States v. Crumley*, 565 F.2d 945, 949 (5th Cir.1978), the right to cross-examine is not absolute. Since deciding *Davis*, the Supreme Court has reaffirmed that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only

marginally relevant...." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). Nevertheless, the Court has carefully distinguished between the imposition of "reasonable limits on" inquiry and the prohibition of "*all* inquiry into" specific areas of possible bias. *Id. See also Davis v. Alaska*, 415 U.S. at 318, 94 S.Ct. at 1111 ("While counsel was permitted to ask [the witness] *whether* he was biased, counsel was unable to make a record from which to argue *why* [the witness] might have been biased....") (emphasis in original).

■ In the present case, Judge Katz precluded Wood from all cross-examination intended to establish that Q.C. was subject to the terms of a "conduct agreement," a type of informal juvenile probation, when he first reported being sexually abused by Wood and when he testified against Wood before the grand jury. The pendency of the conduct agreement and Q.C.'s express admission that he had engaged in the delinquent behavior upon which that agreement was based were certainly "facts ... that might suggest to the jury a motive for ... [Q.C.] to testify favorably for the state." *McKinzy v. Wainwright*, 719 F.2d at 1529. Had the jury been aware of these facts, Wood's counsel could have argued that Q.C.'s initial report of abuse to Farrell was motivated by his desire to be cooperative in order to avert the risk that the state might seek to terminate his conduct agreement and initiate delinquency proceedings.

Limiting Wood's ability to advance this theory of bias seems especially problematic in light of the specific facts of this case. Q.C. originally told Trooper Kord, in March of 1988, that, except for one incident involving a cousin and another involving a former friend of his mother, he had never been sexually abused. At the outset of the December 16, 1988, interview with Trooper Farrell, Q.C. denied being abused by Wood. Q.C. only reported that Wood had molested him after Farrell refused to accept Q.C.'s denial and "bluffed" by saying that he already knew what had occurred.

Without evidence of the pending conduct agreement, Wood was certainly free to argue that the manner in which Farrell conducted the December 16 interview was unduly suggestive; but the jury could have no basis for concluding that Q.C. had any reason to accommodate Farrell by fabricating a claim of abuse. Had Wood been permitted to establish the existence of the conduct agreement, the evidence would have allowed him to argue not only that Farrell suggested what he wanted Q.C. to say, but also that Q.C. was strongly motivated to say what Farrell evidently wanted to hear.

Judge Katz' decision to preclude cross-examination on this issue seems to have been based in part on the conclusion that Q.C.'s conduct agreement was unrelated to Wood's case and apparently contained no express requirement of cooperation with the state. But such considerations are not determinative: "The test is the witness' expectation or hope of a reward, not the actuality of a promise by the State." *State v. Little*, 87 Ariz. 295, 299, 350 P.2d 756, 760 (1960), *quoted in Whitton v. State*, 479 P.2d 302, 317 (Alaska 1970). As held in *Commonwealth v. Cauto*, 535 A.2d at 605:

> Even if the prosecutor has made no promises, either on the present case or on other pending criminal matters, the witness may hope for favorable treatment from the prosecutor if the witness presently testifies in a way that is helpful to the prosecution. And if that possibility exists, the jury should know about it.

The state argues that Q.C.'s conduct agreement was too "remote" to warrant cross-examination, because the agreement was evidently meant to remain effective for only a one-year term beginning in May of 1988; it had thus expired by the time Q.C. testified at trial in November of 1989. This argument is unpersuasive.

The United States Supreme Court dealt with a similar situation in *Davis v. Alaska*. The Court in *Davis* described the position taken by defense counsel at trial as follows:

> In the instant case, defense counsel sought to show the existence of possible bias and prejudice of [the witness], caus-

ing him to make a faulty initial identification of petitioner, which in turn could have affected his later in-court identification of petitioner.

*Davis v. Alaska,* 415 U.S. at 317, 94 S.Ct. at 1111 (footnote omitted). With regard to defense counsel's position, the *Davis* court cited with approval the following passage from 3A J. Wigmore, *Evidence* § 940, p. 776 (Chadbourn rev. 1970):

> [A] *partiality* of mind at some *former time* may be used as the basis of an argument to the same state at the time of testifying; though the ultimate object is to establish partiality at the time of testifying.

*Davis,* 415 U.S. at 317 n. 5, 94 S.Ct. at 1111 n. 5 (emphasis in original).

Here, even though Q.C.'s conduct agreement had apparently expired by the time Wood was brought to trial, it is undisputed that the agreement remained in effect when Farrell interviewed Wood on December 16, 1988, and also when Q.C. testified before the grand jury in March of 1989. At trial, Q.C. may well have felt committed to conform his testimony to the version of events he had already given Farrell and had repeated under oath to the grand jury.[3]

■ In barring cross-examination concerning the conduct agreement, Judge Katz concluded that the probative value of this evidence would be outweighed by its potential for prejudice. However, the judge did not specify the nature of the prejudice upon which she based this conclusion. The United States Supreme Court's ruling in

*Davis* precludes a finding that the relevance of the proposed cross-examination would be outweighed by the prejudice stemming from a violation of the state's interest in preserving the confidentiality of Q.C.'s juvenile record. It seems more likely that Judge Katz was concerned—and properly so—with the potential for prejudice inherent in informing the jury that Q.C. had himself engaged in sexually abusive conduct toward òthers. Such information would inevitably have created at least some risk that jurors might view Q.C. as an unsavory person who was unworthy of the full protection of the law, regardless of the credibility of his claims.

This potential source of prejudice, however, did not justify a complete preclusion of inquiry into Q.C.'s conduct agreement. Here, as an alternative to barring inquiry altogether, Judge Katz could readily have avoided undue prejudice by placing "reasonable limits," *Delaware v. Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435, on the scope of cross-examination. For example, Judge Katz could have allowed Wood to establish the existence of the conduct agreement and of the general fact that the agreement was based on Q.C.'s admitted involvement in delinquent behavior involving conduct amounting to a felony, while restricting inquiry into the details and specific nature of the delinquency charge.

Moreover, while restricting cross-examination on the issue of motive, Judge Katz allowed Wood's counsel to question Q.C. about Q.C.'s abuse of J.P., in order to establish Q.C.'s knowledge of the term "mo-

---

**3.** For its claim of remoteness, the state relies on *Coffey v. State,* 585 P.2d 514, 522–24 (Alaska 1978). *Coffey* was a case involving an illegal drug sale, in which the defendant sought to cross-examine the undercover informant about a prior misdemeanor charge that had been brought against the informant in another state. The prior charge had already been dismissed when the alleged offense was committed. There was no evidence indicating that the dismissal was conditioned on the informant's continued good conduct. At the time of the alleged transaction, the informant was seeking to become a regular member of the Alaska State Troopers. By the time of trial, he had achieved this status and had completed a one-year probationary period. During trial, the court allowed defense counsel broad latitude in cross-exami-

nation to establish that, at the time of the alleged offense, the informant was highly motivated to enhance his prospects for employment as a trooper by making successful cases as an undercover informant. The trial court precluded cross-examination into the previously dismissed conviction, however, and the Alaska Supreme Court affirmed on appeal. The circumstances in *Coffey* are readily distinguishable from those in the present case. Here, Q.C. was expressly required to remain on good behavior for the duration of his conduct agreement, which had not yet expired when he made his initial claims of abuse. Moreover, Wood's cross-examination of Q.C. at trial revealed no independent evidence indicating bias or a motive to fabricate the claim of sexual abuse against Wood.

lesting."[4] Given the court's willingness to admit evidence of the J.P. incident for this purpose, the risk of incremental prejudice resulting from Wood's proposed cross-examination concerning the conduct agreement would at most have been marginal, and would not have outweighed the probative value of the evidence.

■ In the present case, Q.C. was the state's primary witness against Wood; corroborating evidence was minimal, and the state's case hinged on Q.C.'s credibility. Under the circumstances, we are unable to say that the error in precluding cross-examination on the issue of motive was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Wood's conviction must therefore be REVERSED.[5]

---

**4.** As we have indicated in footnote 2, *infra,* although the trial court's ruling allowed the jury to learn that Q.C. had evidently molested J.P., it did not permit Wood to establish that Q.C. had eventually entered into a conduct agreement in connection with the incident, by virtue of which he remained vulnerable to delinquency proceedings when interviewed by Farrell on December 16, 1988. In connection with the inquiry into Q.C.'s abuse of J.P., Judge Katz expressly cautioned the jury that the evidence was to be considered for the sole purpose of establishing Q.C.'s understanding of the term "molesting." Wood's ability to cross-examine Q.C. concerning the J.P. incident for this limited purpose cannot be deemed to offset the improper restriction of Wood's right to inquire on the issue of motive: "[T]he unconstitutional limit of cross examination is not cured simply by acknowledging that other means of impeachment were possible and permitted." *McKinzy v. Wainwright,* 719 F.2d 1525, 1529 (11th Cir.1983).

**5.** Our decision renders it unnecessary for us to consider Wood's remaining claims of error except in passing, to provide guidance to the parties and the trial court in the event of a retrial. With regard to Wood's claim that the trial court erred in denying his motion to suppress for lack of particularity, we conclude that the trial court did not err in finding portions of the challenged warrant sufficiently particular, *see Namen v. State,* 665 P.2d 557, 562–63 (Alaska App.1983), and *United States v. Spilotro,* 800 F.2d 959 (9th Cir.1986), or in relying on the doctrine of severability to allow admission of evidence seized under those portions, *see generally* 2 W.R. LaFave, *Search and Seizure* § 4.6(a), at 234–42 (2d ed. 1987). In any event, the seized articles admitted at trial were of minimal probative value; any error in failing to suppress them would appear to have been harmless. We note, moreover, that, apart from asserting his claim that the articles were illegally seized, Wood did not object to their admission. Because some of the disputed articles would arguably be excludable on relevance grounds, *see Page v. State,* 657 P.2d 850 (Alaska App.1983), our resolution of Wood's suppression claim may not be determinative of the issue of admissibility in the event of a retrial.

With regard to Wood's claim that the trial court erred in failing to declare a mistrial as a result of various discovery violations by the state, we conclude that the sanctions imposed against the state at trial were fully adequate and that the court did not err in refusing to dismiss the case. *See Williams v. State,* 629 P.2d 54, 64 (Alaska 1981); *Putnam v. State,* 629 P.2d 35, 43 (Alaska 1980); *Abdulbaqui v. State,* 728 P.2d 1211 (Alaska App.1986).