**Chris BRAUND, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–7083.**

Court of Appeals of Alaska.

Nov. 9, 2000.

---

**24.** 897 P.2d 33, 44 n. 12 (Alaska 1995) (citations omitted).

Maria Bahr, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Marcelle K. McDannel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

Chris Braund was charged with fourth-degree controlled substance misconduct and tampering with physical evidence [1] after police executed a search warrant at his residence and found two trash bags containing 341 grams (about 12 ounces) of marijuana roots and stalks. Following a jury trial, Braund was convicted of both charges. However, we conclude that Braund's convictions must be reversed because the trial judge improperly prevented Braund from cross-examining a witness concerning the favorable treatment that this witness had received from the State.

In addition, it is possible that the evidence against Braund must be suppressed. The police had a warrant to search Braund's residence, but they actually conducted two searches. After the police finished their initial search and left the residence, they realized that they had not searched the yard behind Braund's house. They promptly returned to Braund's property, searched the yard, and discovered the 341 grams of marijuana plants. This renewed search may have violated the rule that a search warrant generally authorizes only one intrusion. Because this issue turns on the specific facts of the case, and because the superior court did not specifically address this problem, we remand Braund's case for additional proceedings on this issue.

*The denial of Braund's right to cross-examine Johanna Hoffman*

*(a) Hoffman's involvement in the case*

One of the witnesses against Braund was a woman named Johanna Hoffman. Hoffman was the one who informed the police that Braund was growing marijuana.

In the early morning of November 19, 1996, the Alaska State Troopers received a 911 call from Hoffman. Hoffman was calling from Braund's house. She told the dispatcher, "This person has an attitude. Help me. I just want to go home." Hoffman identified the "person" as Chris Braund. Almost immediately, Braund got on the phone and complained to the dispatcher about Hoffman's behavior. Braund told the dispatcher:

> [S]he's been drinking all night and ... I just want her out of here.... I really don't know what to do: I've told her [to leave] three times, she's still standing right here.... I just ... want her to leave my house.

Braund began giving the dispatcher directions to the house (which was located on an unmarked road off the Seward Highway and had no address). Then Hoffman got back on the phone. The dispatcher asked her, "Well, what's going on? ... [H]e just doesn't want you there anymore?" Hoffman responded, "He's growing pot and ... I just don't want to be here.... I just want to get back home, with my parents."

Trooper Joseph Masters arrived at Braund's residence about forty minutes later. He found Hoffman and Braund standing in the driveway. Masters interviewed Hoffman in his patrol car. She repeated her allegation that Braund was growing marijuana in his house and in an adjacent garage. Masters left Hoffman in the patrol car and knocked on the door of Braund's residence. He asked Braund if he was growing marijuana. Braund replied by giving Masters permission to search his house.

Masters walked through the house with Braund. During this search, Masters found a twelve-pack of starter marijuana plants on the floor of a bedroom closet. Only one of the plants was still living. Trooper Masters asked Braund if the marijuana was for personal use, and Braund replied that it was. He denied selling marijuana.

During the search of the rest of the house, Masters found a "marijuana light" on a kitchen counter. He also observed a locked door to a room in the basement; Braund ex-

1. AS 11.71.040(a)(2) and AS 11.56.610(a)(1), respectively.

plained that a friend of his was using this room for storage and that he didn't have a key. Masters observed a rolled-up towel against the bottom of that door. Lastly, Masters observed that the basement was unusually warm—approximately 85 degrees. Braund explained that he heated the house from the basement, and that he had cut a hole in the ceiling to permit the heat to circulate to the upstairs rooms.

Masters issued Braund a citation for sixth-degree controlled substance misconduct (a class B misdemeanor) for the small marijuana plant in the closet.[2] Masters then returned to his car and spoke with Hoffman again.

During this second interview, Hoffman claimed that Braund had shown her marijuana plants in his home earlier in the week. She said that the plants were being grown inside a locked room in the basement. She told Masters that, while she was making the 911 call, she watched Braund going up and down the stairs several times, taking garbage bags out of the house. She claimed that Braund had told her the plants were worth roughly $2,000 each, and that he estimated that he probably had $50–60,000 worth of marijuana. She also told the trooper that, although there were only five or six marijuana plants inside Braund's house, there were "a whole bunch" of plants in the garage adjacent to the house.

Based on Hoffman's statements and Masters's observations, the troopers obtained the warrant to search Braund's residence.

### (b) Braund's proposed cross-examination of Hoffman

■ Hoffman testified for the state at Braund's trial. Braund (who represented himself at trial) told Superior Court Judge Larry D. Card that he wished to cross-examine Hoffman concerning her recent arrest for possession of a crack pipe. Judge Card told Braund that he did not believe the criminal charge against Hoffman was relevant. After discussing the potential relevance of the proposed cross-examination for several minutes, Judge Card asked the prosecutor if he knew

anything about Hoffman's arrest. The prosecutor replied that Hoffman indeed had been arrested on February 5, 1998 (five weeks before Braund's trial) and charged with fourth-degree controlled substance misconduct for possessing a crack pipe. The prosecutor added that the District Attorney's Office had declined to prosecute Hoffman's case because "it did not meet [their] office policy for prosecution of those offenses".

During the ensuing discussion, Judge Card asked Braund if he believed that Hoffman received a break—that "the State did her a favor and declined [prosecution]"—because she was a witness in Braund's case. Braund replied, "That's exactly it." Judge Card then ruled that Braund could not ask Hoffman about her favorable treatment unless he had some independent evidence that the District Attorney's Office formally gave Hoffman favorable treatment in exchange for her testimony:

> The Court: [Unless] you have a good-faith basis, you can't just . . . ask [Hoffman such questions]. You can ask the State. They'll tell you one way or the other [whether they gave Hoffman favorable treatment in exchange for her testimony]. If they did, you can ask [your proposed] question; [then] that would be very relevant.
>
> . . .
>
> But you're speculating, sir. I mean, . . . if [the State has] given somebody a break, they'll say, "Look, we declined this. We didn't want to [pursue the charge] because she's a potential witness ." They'll say that. Often, they'll put [such] things in writing. So you ask [the prosecutor].
>
> Braund: Okay.
>
> The Court: Come back [if] you have . . . a good-faith basis for asking that question[.]
>
> Braund: Okay.
>
> The Court: If [the prosecutor], as the State's representative, says "no", [then] the State's bound by that, and you are [also]. If you later find out that there was a formal agreement [between the State and Hoffman], then this case is going to

---

2. This charge was apparently dropped.

get busted.... I'll reverse [your conviction] and we'll start over.... All right, that's the rul[ing].

██ The constitution guarantees criminal defendants the right to confront and cross-examine witnesses. One of the main components of this guarantee is the right to question a witness's motivation or bias.[3] "The partiality of a witness ... is always relevant as discrediting the witness and affecting the weight of his testimony."[4] For this reason, a trial judge "must be particularly solicitous toward cross-examination that is intended to reveal bias, prejudice, or motive to testify falsely."[5]

In *Mustafoski v. State*[6], this court addressed a situation similar to the one presented in Braund's case. A government witness had been charged with a felony and then had been allowed to plead to reduced charges (two misdemeanors). This court ruled that the defense "was entitled to elicit these facts and argue that [the witness] might be biased in favor of the State after receiving a lenient disposition of the charge."[7]

As explained above, Judge Card was willing to let Braund question Hoffman about the favorable resolution of the crack cocaine charge only if the State conceded that the dismissal of that charge had been the *quid pro quo* for Hoffman's testimony against Braund. This was error.

The State dismissed a felony charge against Hoffman just before she was to testify against Braund. This sequence of events, in itself, raised an inference of favoritism. Braund was entitled to present the facts and ask the jury to draw the inference. If the State wished to prove that the District Attorney's Office was simply following established policy and that no favoritism was involved, the State was free to present witnesses on this issue. But it was error to prohibit Braund from cross-examining Hoffman on this issue unless the government explicitly conceded the existence of the deal that Braund was trying to prove.

Moreover, as this court noted in *Wood v. State*, "the test is the witness' expectation or hope of a reward, not the actuality of a promise by the State."[8] Even if there was no formal agreement between Hoffman and the State, Hoffman might have subjectively believed that her willingness to testify against Braund was the reason the State chose to dismiss her possession-of-cocaine charge. Conceivably, Hoffman might also have believed that the felony charge could be revived if she did not continue to cooperate. Braund should have been allowed to cross-examine Hoffman concerning these potential grounds of bias.

██ The State argues that even if Braund's right of cross-examination was unlawfully abridged, this error was harmless. Because we are dealing with constitutional error, it is the State's burden to show that the error was harmless beyond a reasonable doubt.[9] In Braund's case, we can not say that the unlawful restriction on cross-examination was harmless.

Braund was convicted of possessing marijuana for purposes of delivery. The State correctly points out that the physical evidence against Braund was derived from the search of his residence. But, as explained above, that search yielded only one small live plant from Braund's house and, in the yard, discarded marijuana plants that weighed about 12 ounces (including roots and stalks).

3. See *Davis v. Alaska*, 415 U.S. 308, 316–18, 94 S.Ct. 1105, 1110–11, 39 L.Ed.2d 347 (1974); *Johnson v. State*, 889 P.2d 1076, 1080 (Alaska App.1995); *Wood v. State*, 837 P.2d 743, 745–47 (Alaska App.1992).

4. *Davis v. Alaska*, 415 U.S. at 316, 94 S.Ct. at 1110 (quoting John Wigmore, *Evidence in Trials at Common Law* (Chadbourn rev.1970), § 940, Vol. 3A, p. 775).

5. *Wood v. State*, 837 P.2d 743, 745 (Alaska App. 1992).

6. 954 P.2d 1042 (Alaska App.1998).

7. *Id.* at 1047.

8. 837 P.2d 743, 747 (Alaska App.1992).

9. See *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Love v. State*, 457 P.2d 622, 631 (Alaska 1969).

On the issue of whether Braund's marijuana was for personal use or commercial purposes, this physical evidence left the matter debatable.

But Johanna Hoffman testified that Braund had 20 marijuana plants growing inside the house and more than 100 plants in the adjacent building. According to Hoffman, Braund bragged that "he probably [had] $50–60,000 worth of plants". Hoffman's testimony was among the State's strongest evidence that Braund was growing marijuana for commercial purposes. We therefore conclude that the restriction on Braund's right to cross-examine Hoffman was not harmless. Braund's conviction must be reversed.

### The sufficiency of the search warrant application, and the sufficiency of the evidence at trial

Although we are reversing Braund's conviction, we must address three other issues that he raises. Two of these issues involve the sufficiency of the evidence to support the search warrant and the sufficiency of the evidence to support Braund's conviction.

First, Braund contends that the search warrant issued for his residence should be thrown out because, when the troopers applied for the warrant, they misstated some pertinent facts and failed to mention others. Braund also contends that the troopers failed to present sufficient corroboration of Hoffman's credibility to satisfy the *Aguilar-Spinelli* test.[10] We agree with the State that Braund failed to preserve these issues in the trial court.

■ Next, Braund argues that the State's evidence at trial was insufficient to support his convictions. Braund's argument depends on viewing the evidence in the light most favorable to himself. But we are obliged to view the evidence in the light most favorable to upholding the jury's verdicts.[11] Viewing the evidence in that light, we conclude that the evidence supports Braund's convictions.

### The debatable second search of Braund's property

The final issue we must address is the legality of the second search of Braund's property. As explained above, the police had a warrant to search Braund's residence (his house, a neighboring apartment, plus the adjacent garage) and Braund's vehicle for evidence of a marijuana-growing operation. The problem in this case arises because the troopers entered Braund's premises twice when they executed this warrant.

#### (a) Facts of the two searches

When the troopers began their initial search, Braund gave them a key to a locked basement room, and then he left the premises. The troopers had the place to themselves.

Inside the locked basement room, the troopers found an apparatus that might have been used for track lighting. They also found wooden boards with water stains, and a stand that might have been used for a fan. A nearby closet yielded lights, heat reflectors and empty planting pots. The troopers' search of the rest of Braund's house revealed a triple-beam scale, some dried marijuana in a tin in the kitchen, some marijuana seeds and pipes, and a book described as a "marijuana grower's handbook". But neither the house nor the nearby buildings contained any marijuana plants. The troopers concluded their search at 9:50 a.m.

The search team left Braund's property and re-assembled at a nearby gas station on the Seward Highway. As they discussed the search, the lead trooper, Sergeant Franco D'Angelo, realized that no one had searched the grounds behind Braund's house. D'Angelo also realized that he had forgotten to leave Braund a copy of the inventory of items seized. So D'Angelo returned to Braund's

---

**10.** See Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). And see State v. Jones, 706 P.2d 317, 324–25 (Alaska 1985) (holding that, as a matter of state law, the Aguilar-Spinelli test continues to govern the evaluation of hearsay information offered to support a search or seizure).

**11.** See Dorman v. State, 622 P.2d 448, 453 (Alaska 1981); Silvernail v. State, 777 P.2d 1169, 1172 (Alaska App.1989).

residence to search the grounds and to leave a copy of the inventory.

At the bottom of the hill behind Braund's house, D'Angelo found and seized two trash bags containing dirt, roots, and stalks of several marijuana plants, and some reflective Mylar material. The total weight of the seized plants (after processing) was 341 grams—slightly more than 12 ounces. Two of Braund's fingerprints were later found on the bags.

### (b) The "one warrant, one search" rule, and the federal authority that rejects this rule

Braund challenges the troopers' second entry onto his land. He asserts that, once the troopers decided that their search was complete, and once they voluntarily ceased their search and left his premises, they had no authority to return unless they obtained another warrant.

Braund's argument is based on the majority rule in this country that "a warrant may be executed only once".[12] Under this rule, if the police execute a warrant, perform a search, and then leave, they may not return to search again unless they have secured another warrant[13] or unless the search is authorized by some exception to the warrant requirement.[14] The rationale for the "one warrant, one search" rule was explained by the Tennessee Supreme Court in *McDonald v. State:* if the law allowed the police to repeatedly enter and search a residence or business at will until the warrant expired, the warrant "could become a means of tyrannical

oppression in the hands of an unscrupulous officer".[15]

Professor LaFave gives an example of the operation of this rule:

> [W]here the police unsuccessfully searched premises for a gun and departed[,] but then returned an hour later and searched further because in the interim an informant told the police of the precise location of the gun, the second search could not be justified as an additional search under the authority of the warrant.

Wayne R. LaFave, *Search and Seizure* (3rd ed., 1996), § 4.10(d), Vol. 2, p. 679.

There is, however, a (short) line of federal cases rejecting the majority rule and adopting the contrary rule that a search warrant remains active until it expires, no matter how many times it has been executed. The first in this series of cases was the Sixth Circuit's decision in *United States v. Bowling.*[16] In *Bowling,* the court declared that even though a search warrant had been served the previous day, this fact "did not vitiate its powers [on] the following morning" because, under applicable state law, the warrant did not expire for another seven days.[17] The *Bowling* court provided no authority for this statement, and the court did not acknowledge the majority rule to the contrary. Nevertheless, the Eighth Circuit has followed *Bowling*'s suggestion that a search warrant can be repeatedly executed until it expires.[18]

In Braund's case, we need not definitively decide which of these rules to follow. The State concedes that the normal rule is "one warrant, one search", and the State does not

---

**12.** Wayne R. LaFave, *Search and Seizure* (3rd ed., 1996), § 4.10(d), Vol. 2, p. 679. *See State v. Piña,* 94 Ariz. 243, 383 P.2d 167 (1963), *overruled on other grounds, Yuma County Attorney v. McGuire,* 111 Ariz. 437, 532 P.2d 157 (1975); *Delaney v. State,* 135 Ga.App. 612, 218 S.E.2d 318 (1975); *State v. Parsons,* 83 N.J.Super. 430, 200 A.2d 340 (1964); *McDonald v. State,* 195 Tenn. 282, 259 S.W.2d 524 (1953).

**13.** *See LaFave,* § 4.10(d), Vol. 2, p. 679.

**14.** *See State v. Trujillo,* 95 N.M. 535, 624 P.2d 44, 48 (1981) (upholding a second search when that search was justified by exigent circumstances); *United States v. Gagnon,* 635 F.2d 766, 768–69 (10th Cir.1980) (Federal agents served a search

warrant and found a huge quantity of marijuana, too big to carry away without special transport; the court ruled that the agents could lawfully remain on the property overnight to secure the marijuana. The court noted that the agents slept in their vehicles and did not interfere with the property owner's use of the property except to the extent needed to safeguard the contraband.).

**15.** 259 S.W.2d at 525.

**16.** 351 F.2d 236 (6th Cir.1965).

**17.** *Id.* at 241.

**18.** *See United States v. Carter,* 854 F.2d 1102, 1107 (8th Cir.1988).

ask us to adopt the *Bowling* rule. Moreover, as explained in the next section, even though Judge Card upheld the second entry onto Braund's land, he implicitly assumed that a search warrant normally authorizes only one search. We therefore confine our discussion to the "one warrant, one search" rule, and how this rule might apply to Braund's case.

### (c) The exceptions that some courts have recognized to the "one warrant, one search" rule

As we have explained, the majority rule is that the police may perform only one search per warrant. Yet, sometimes, even those courts which adhere to the "one warrant, one search" rule will uphold a second or renewed search under the same warrant. The facts of these cases vary widely, and it is difficult to educe one rule of decision that adequately explains them all. But, speaking generally, these courts have upheld a second search if there was an articulable reason why the subsequent search should be viewed as a continuation of, or a necessary follow-up to, the first search.

For instance, in *People v. Schuldt*[19], the police searched an apartment, seized several items, and placed them in evidence bags, but then they inadvertently left some of these items behind when they departed. A few hours later, after trying unsuccessfully to contact the owner of the apartment and get his permission to· return, the police broke into the apartment to retrieve these items. The Illinois court held that this second entry to regain control of the evidence was authorized by the search warrant.[20]

Similarly, in *Commonwealth v. Baldwin*[21], the police executed a warrant at an auto shop to search for stolen vehicles. The officers wrote down the vehicle identification numbers of the cars in the shop, and they checked these numbers on their computer, but none of the vehicles appeared to be stolen. Later, the police realized that they had not performed the computer check correctly, so they ran the VINs again. According to the new computer check, one of the vehicles they had seen was reported stolen. The officers returned to the auto shop the next day and asked to see this particular vehicle, but now it was missing. Two of the auto shop employees suggested that the car must have been stolen from the shop overnight. The police officers were skeptical of this explanation. They undertook a more rigorous search of vehicles, parts, and paperwork—thereby uncovering more stolen vehicles.[22]

The Massachusetts court upheld this second search on two alternative grounds. The court noted that a state statute authorized certain public officials (and police officers at their direction) to examine the inventory and paperwork of any used car dealer (apparently, for evidence of trafficking in stolen vehicles).[23] But the court also held that the second search was authorized by the search warrant that had initially been served the day before.[24]

In *United States v. Huslage*[25], the police used a flashlight to search an automobile at 4:00 in the morning, just one hour before their warrant was to expire. They were looking for a pistol, which they did not find. But one of the officers involved in the case was insistent that there had been a pistol in the car earlier. So later in the morning—at around 10:00—the officers looked again. This time, they found the pistol concealed behind an interior panel.[26] The court upheld the second search as a continuation of the first, a continuation that was needed so that the police could search the car in daylight.[27]

19. 217 Ill.App.3d 534, 160 Ill.Dec. 545, 577 N.E.2d 870 (1991).

20. *See id.* at 875.

21. 11 Mass.App.Ct. 386, 416 N.E.2d 544 (1981).

22. *See id.* at 546–47.

23. *See id.* at 549–551 and at 546 n. 1 (quoting the pertinent statute).

24. *See id.* at 549–550.

25. 480 F.Supp. 870 (W.D.Pa.1979).

26. *See id.* at 874–75.

27. *See id.*

*(d) Judge Card's ruling that D'Angelo's second entry onto Braund's property was merely a continuation of the initial search, and why we reject that ruling*

■ Judge Card adopted a similar approach in Braund's case. The judge ruled that Sergeant D'Angelo's return to the premises was not a second search, but merely a continuation of the initial search. He found that D'Angelo had a valid purpose for re-entering the premises: the officer had forgotten to leave Braund an inventory of the property seized during the search. (The law requires the police to give a copy of this inventory to the property owner.[28]) Judge Card concluded that, because D'Angelo had not yet completed his duties with respect to serving the warrant, D'Angelo was authorized to return to Braund's premises and, once there, he could continue the search.

We acknowledge that it seemingly makes sense to allow police officers to return to re-enter the property if they have inadvertently left items of evidence behind or, as in Braund's case, if they have inadvertently failed to perform a task that is part of their legal duty when serving a search warrant. Nevertheless, we are hesitant to fully endorse this approach, at least at this time. There are two potential problems with such a rule.

■■ First, with regard to the specific facts of Braund's case—the troopers' failure to leave a copy of the inventory—it seems counter-intuitive to authorize the troopers to commit a second trespass onto Braund's land so that they can perform a task that the law requires for Braund's benefit. A property owner is entitled to an inventory so that they can ascertain what has been taken from them during a search.[29] But the law also requires the police to file the same inventory with the court that issued the search warrant.[30] Because a property owner can obtain a copy of the inventory from the court, there seems to be little justification for authorizing the police to re-enter the property without the property owner's consent, or even against the property owner's will, to remedy their failure to leave a copy of the inventory on the premises. It would seem more consistent with a property owner's rights to make the police contact the owner and either mail the inventory to them or seek their permission to return to the premises.

Second, if we ruled that a second, non-consensual entry is always allowed whenever the police leave an item of evidence behind or whenever they fail to leave a copy of the inventory at the residence, police officers might soon discover a substantial benefit in "inadvertently" doing these things. Because of this act of "inadvertence", they could perform a surprise second search when they went back to rectify their "error".

But we need not decide this issue in Braund's case. For even if we assume that D'Angelo was authorized to re-enter Braund's property to leave a copy of the inventory, this does not mean that D'Angelo could initiate a search of the back yard. Judge Card found that D'Angelo's renewed intrusion onto Braund's land was justified because the officer had yet to fulfill a particular warrant-related task. This being so, the *scope* of D'Angelo's renewed intrusion would be limited by the rationale that brought him back to Braund's residence.

D'Angelo returned to leave a copy of the inventory inside Braund's front door. To accomplish this task, D'Angelo had no need—and therefore no authority under a "one warrant, one search" rule—to walk around to the back of the house and search Braund's yard for additional evidence of marijuana cultivation. Thus, even if we assume that D'Angelo was authorized to commit a second trespass onto Braund's land in order to leave a copy of the inventory (*i.e.*, to fulfill his administrative duties under AS 12.35.020(b) and Alaska

---

**28.** *See* AS 12.35.025(b) and Alaska Criminal Rule 37(b).

**29.** "Notice that property has been seized pursuant to a search warrant is intended to protect the possessor's rights in relation to the seized property. The notice enables the person to protect possessory interests in the property; it also helps assure that the government will not put the property to improper or unfair use." *Steffensen v. State*, 900 P.2d 735, 742 (Alaska App.1995).

**30.** *See* AS 12.35.020(c)-(d) and Alaska Criminal Rule 37(b).

Criminal Rule 37(b)), this second authorized trespass was necessarily of limited scope, and D'Angelo exceeded that scope. The search of Braund's back yard can not be upheld on this basis.

### (e) The State's alternative rationale

Because the troopers' duty to leave a copy of the inventory at Braund's house did not justify the entry into Braund's back yard, the State must provide an alternative rationale for that search. The State suggests one. The State argues that the inventory issue is ultimately irrelevant because, even without reference to the inventory, the troopers' return and their search of Braund's yard should be deemed merely a continuation of the initial intrusion authorized by the warrant.

The State points out that the scope of the second search was consistent with the search originally authorized by the warrant, and that the items seized were the types of property covered by the warrant. The State also points out that the troopers came back to Braund's property only a few minutes after they quitted it. The State argues that this short interval was not significant enough to constitute a new invasion of Braund's privacy rights, especially given the fact that the sole occupant of the residence, Braund, was not home. The State also notes that the troopers simply searched a portion of the premises that they had been authorized to search and had inadvertently overlooked. Thus, the State concludes, the troopers worked no constitutional harm when they returned.

To answer the State's argument, we must address two questions: Should Alaska adopt the "one warrant, one search" rule? And, assuming that we do adopt this majority rule, what is the precise meaning of "one search"?

We have several reasons for declining to answer these questions at this time. First, neither party has directly addressed the question of whether the "one warrant, one search" rule is preferable to the *Bowling* rule. (The State has argued Braund's case under the assumption that the "one warrant, one search" rule controls.) Second, as explained above, Judge Card decided Braund's suppression motion on a different ground: he upheld the search because D'Angelo, by failing to leave a copy of the inventory, had not yet completed the execution of the warrant. Having adopted this rationale, Judge Card did not have to address the harder issues posed by the State's alternative argument that two police entries onto a person's property should be deemed a single search if the two entries are performed close in time and are motivated by the same purpose. Finally, Braund represented himself at trial; because of this, we can not be sure that the legal complexities of these issues were adequately aired when Judge Card was asked to make his decision. Now Braund is represented by the Public Defender Agency.

For these reasons, and because we have ruled that Braund is entitled to a new trial in any event (because he was denied his right to cross-examine Johanna Hoffman), we conclude that the best and most prudent course is to allow the parties to re-litigate the legality of the second search when Braund's case returns to the superior court.

### Conclusion

Because Braund was denied his right to cross-examine a government witness concerning her potential bias, we REVERSE Braund's convictions.

Further, the superior court's decision upholding the troopers' search of Braund's back yard is VACATED. If the State chooses to re-prosecute Braund, the superior court is directed to reconsider this issue in light of the cases we have discussed in this opinion (as well as any others the parties may find).

