Clarence A. **KAMEROFF**, Appellant,

v.

**STATE** of Alaska, Appellee.

No. A–5828.

Court of Appeals of Alaska.

Oct. 11, 1996.

---

G. Blair McCune, Assistant Public Defender, and John B. Salemi, Public Defender, Anchorage, for Appellant.

Joseph E. Wrona, Assistant District Attorney, James K. Metcalfe, District Attorney, Bethel, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

*OPINION*

MANNHEIMER, Judge.

Clarence A. Kameroff appeals his convictions for six misdemeanors: third-degree criminal mischief (joyriding), AS 11.–46.484(a)(2), driving while intoxicated, AS 28.35.030(a), refusing to submit to a breath test, AS 28.35.032(a), driving while his license was suspended, AS 28.15.291(a), reckless driving, AS 28.–35.040(a), and resisting arrest, AS 11.56.700(a)(1). For the reasons explained below, we reverse three of these convictions and affirm the other three.

On October 7, 1994, Bethel Police Officer Kevin Short saw a truck driving after dark with its headlights off. The truck was weaving in and out of the oncoming lane of traffic; it narrowly missed two parked cars and a utility pole. Officer Short stopped the truck; Clarence Kameroff was driving. Kameroff appeared to be very intoxicated; his speech was slurred, his eyes were watery and extremely bloodshot, and he smelled strongly of alcoholic beverages. The truck had been reported stolen by its owner, Michael Carr. Kameroff physically resisted the efforts of Short and other officers to place him under arrest. Based on this incident, a jury convicted Kameroff of the six offenses listed above.

██ Kameroff argues that the district court should have dismissed the breath-test refusal charge because the Department of Public Safety had already taken administrative action against Kameroff's driver's license based on his same act of refusing to take the breath test. Kameroff argues that his criminal sentence for refusing to take the breath test constitutes an unconstitutional second punishment for the same act. This contention is answered by our decision in *State v. Zerkel*, 900 P.2d 744 (Alaska App.1995), where we rejected an identical double jeopardy claim.

██ Kameroff next argues that the police unlawfully refused to allow him to contact an attorney before he made his decision whether to take the breath test. Because of this, Kameroff argues, the district court should have dismissed the breath-test refusal charge and also should have suppressed the videotape that the police made at the station following Kameroff's arrest.

As recorded in the videotape, Kameroff repeatedly asked to telephone an attorney before taking the breath test. The officers refused to allow Kameroff access to a telephone, instructing him that he had to calm down first. After watching the videotape, Superior Court Judge Dale O. Curda ruled that the officers' response (their refusal to allow Kameroff to use a telephone) was justified by Kameroff's agitated, volatile state.

The videotape does indeed show that Kameroff was agitated and volatile at the police station. Throughout the tape, he yelled at the officers and at the video camera, and he repeatedly moved about the room despite instructions to remain still. However, Kameroff was not incoherent. Shortly after his arrival at the station, Kameroff asked to call his lawyer. Officer Short responded, "If you don't calm down, you ain't getting no phone call."

Kameroff did not calm down. Eventually, two officers forcibly sat Kameroff in a chair and handcuffed him to the chair; they then were forced to hold the chair in place as Kameroff tried to move the chair around the room. While this was going on, a third officer prepared the Intoximeter machine for the breath test.

An officer asked Kameroff, "Do you want to blow into the Intoximeter 3000?" Kameroff answered, "Yeah, I'll blow into it." The officers then brought Kameroff's chair over to the machine. But, just as the test was about to be administered, Kameroff turned his head away and said, "I want to call my lawyer first. I'll blow, but I want to call my lawyer first." When the officers showed no sign of complying with this request, Kameroff began shouting that he wanted to talk to his lawyer—that he wanted to take the breath test, but only after talking to his lawyer. In response, the officers repeatedly instructed Kameroff to calm down. Significantly, however, they never again repeated their offer to allow him to speak with his attorney once he calmed down.

Given Kameroff's recalcitrance, the officers moved Kameroff's chair away from the Intoximeter machine and read him the implied consent form (twice). Kameroff appeared to pay no attention; during the reading, he shouted and stamped his feet. After the officer was done reading the implied consent form, Kameroff told him, "I want to take the test; ... I want to take a Breathalyzer." But, despite Kameroff's words, the officers did not bring Kameroff back over to the Intoximeter machine.

At this point, Kameroff asked three times in quick succession, "Can I have my lawyer?" The officers did not answer him. Kameroff then yelled, "I want my lawyer first." Officer Short responded, "You're too wild. We can't let you do that."

Another officer then twice read Kameroff the notice that his driver's license would be revoked on account of his refusal to take the breath test. During both readings, Kameroff kicked at the form in the officer's hand. In response, the officers shackled Kameroff's legs to the chair.

If a person is arrested for driving while intoxicated and requests to contact an attorney, the police must afford the arrestee a reasonable opportunity to contact an attorney before the police require the arrestee to decide whether to take the breath test mandated by AS 28.35.032. *Copelin v. State*, 659 P.2d 1206 (Alaska 1983). However, this right to contact counsel is not an absolute right, "but, rather, a limited one of reasonable time and opportunity". *Copelin*, 659 P.2d at 1212. The question here is whether, in light of Kameroff's agitated and volatile state, the officers acted reasonably when they made no attempt to accommodate Kameroff's request to contact his attorney.

Kameroff argues that, despite his unruly behavior, the officers could have safely allowed him to telephone his attorney if they had assisted him in placing the call, while leaving his handcuffs on. See *Rollefson v. Anchorage*, 782 P.2d 305, 307 (Alaska App. 1989), where the police offered to assist a handcuffed arrestee in finding an attorney's telephone number and placing the call. The State responds that Kameroff was so agitated and physically aggressive that it would have been unreasonable for the officers to assist Kameroff in this manner.

Having reviewed the videotape, we agree with Kameroff that the police did not make reasonable efforts to accommodate his request to telephone his attorney. While it is true that Kameroff eventually became assaultive (during the reading of the license revocation notice), his behavior earlier in the interview was more controlled. We note that, at the beginning of the episode at the police station, the officers were apparently confident enough of their safety that they allowed the handcuffed Kameroff to stand and move about the room. There were several officers in the room at all times. Kameroff was shouting at this time, but he did not approach or threaten any of the officers, and he stayed in the general area of the room to which the officers had restricted him.

It appears that Officer Short's initial response to Kameroff ("If you don't calm down, you ain't getting no phone call.") was not based on the impracticability of affording a phone call to an arrestee who was physically

out of control. Rather, Short's goal was apparently to encourage a noisy, bothersome prisoner to exercise more self-restraint.

The videotape shows that Kameroff's demeanor became more unruly as the interview progressed. However, this was in the face of the officers' repeated refusals to allow him to call his attorney.

■ The right of an arrestee to contact attorneys and friends, as required by AS 12.25.150(b) and by *Copelin*, is not limited to polite prisoners. If this right is to be enforced, the courts can not allow the police to restrict access to the telephone as a means of controlling arrestees' behavior (by withholding access until obstreperous prisoners become more civil).

We re-affirm that an arrestee's right to call an attorney is not absolute. Police officers certainly need not jeopardize their own safety (or the safety of others) to allow a prisoner to make a telephone call. But the police do not have the right to insist that an arrestee be calm before allowing him or her to use the phone. It was the State's burden to prove that the police had good reason to deny Kameroff access to his attorney. The record in this case fails to demonstrate a good reason to hold Kameroff *incommunicado*.[1]

Because Kameroff was unlawfully denied access to an attorney, the district court should have granted Kameroff's motion to suppress the evidence of his refusal to take the breath test. We therefore reverse Kameroff's conviction for breath-test refusal. And, because evidence of Kameroff's refusal to take the breath test was also admitted to prove that Kameroff was driving while intoxicated, *see* AS 28.35.032(a), we must reverse

Kameroff's DWI conviction as well. (The State makes no attempt to argue that admission of this evidence was harmless error with respect to the DWI conviction.)

■ Kameroff asserts that, because he was denied his right to telephone his attorney, the entire videotape of the episode at the police station should be suppressed. However, the abridgement of Kameroff's right to an attorney does not appear to require suppression of the entire episode at the police station. In *Copelin*, the supreme court adopted a more limited remedy for an arrestee who was refused the opportunity to speak with an attorney before deciding whether to take the breath test:

> If the suspect is denied that opportunity, subsequent evidence, whether in the form of the test results or the refusal to submit to it, shall be inadmissible at a later criminal trial.

*Copelin*, 659 P.2d at 1215. Kameroff cites no authority (and presents no other argument) for his requested relief of suppressing the entire encounter at the police station.

Accordingly, we decline to order suppression of the videotape. If Kameroff is retried, and if there are arguments for suppressing the videotape, Kameroff may present these arguments to the trial court.

Kameroff's next two arguments on appeal concern witness Michael Carr. Carr, the owner of the truck that Kameroff was driving, testified for the government at Kameroff's trial. (Carr testified that his truck was stolen shortly before the police stopped Kameroff and that Kameroff had no permission to drive the truck.)

■ Carr was on felony probation at the time of Kameroff's trial. Before trial, Kam-

---

1. Moreover, the videotape appears to demonstrate that Kameroff did not refuse to take the breath test.

  When the officers first asked Kameroff to submit to the breath test (before they read him the implied consent form), Kameroff clearly stated that he was willing to take the test, but only after he spoke with an attorney. The officers refused to allow Kameroff to call an attorney, and instead they read him the implied consent form (telling Kameroff of his legal obligation to take the test and informing him of the consequences of refusal). After the officers read him the im-

plied consent form, Kameroff stated several times that he wanted to take the test. Some of these statements were conditioned on Kameroff's talking to his lawyer first, others were unconditional. In either case, it appears that Kameroff never clearly refused to take the breath test after being informed of the consequences of refusal. *See Suiter v. State*, 785 P.2d 28, 30–31 (Alaska App.1989).

  We do not decide this issue because Kameroff has not argued that the evidence was insufficient to support his conviction for breath-test refusal.

eroff sought disclosure of all pre-sentence reports concerning Carr. Pre-sentence reports are presumptively private. However, Judge Curda examined the pre-sentence reports *in camera* to see whether they contained information that should be disclosed to Kameroff. After examining the reports, Judge Curda determined that they contained no additional relevant information (that is, no relevant information other than the fact that Carr had been convicted of second-degree theft and was currently on felony probation—facts that Kameroff already knew).

Kameroff challenges this ruling on appeal. We have examined the pre-sentence reports and we agree with Judge Curda's ruling: the reports contain no additional relevant information.

■ Kameroff also challenges a ruling that Judge Curda made concerning the scope of Kameroff's cross-examination of Carr. Kameroff wished to question Carr about his status as a probationer; he argued that Carr's probation status was a potential ground of bias—a reason for Carr to favor the government in his testimony. Kameroff's attorney pointed to evidence that Carr's probation officer had recently stated that she was considering filing a petition to revoke Carr's probation (based on an allegation that he had committed a new crime). However, Judge Curda ruled that Carr's probation status was relevant only if Kameroff first demonstrated that Carr's testimony at trial was inconsistent with the statement he had given the police shortly after Kameroff's arrest. In other words, Judge Curda ruled that Kameroff had to demonstrate, as a foundational matter, that Carr's story had changed between the time of the incident and the time of trial, and then evidence of Carr's probation status could be admitted to provide a potential explanation for the discrepancy.

Arguing in support of Judge Curda's ruling, the State points out that Alaska Evidence Rule 403 governs evidence of a witness's bias. That is, a trial judge may exclude relevant evidence of a witness's bias if the probative force of that evidence is outweighed by "the danger of unfair prejudice, confusion of the issues, or misleading the jury", or if the relevance of the evidence is outweighed "by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The State argues that Judge Curda merely required Kameroff to demonstrate "some [reason to believe that] Carr's probation status actually bore on his credibility".

■ As a general matter, the fact that a witness is on probation is recognized as a potential reason why that witness might be biased in favor of the government. *Davis v. Alaska*, 415 U.S. 308, 317–18, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974); *Wood v. State*, 837 P.2d 743 (Alaska App.1992). By making an argument based on Evidence Rule 403, the State implicitly concedes that evidence of Carr's probation status was relevant to Carr's potential bias. The question, then, is whether Judge Curda acted reasonably when he conditioned Kameroff's introduction of this evidence on the foundational showing that Carr had made inconsistent statements.

Judge Curda's ruling appears to be premised on the idea that, even if Carr now faced potential revocation of his probation, this change in Carr's situation had very little relevance unless it could also be shown that Carr's version of events had also changed (ostensibly motivated by his need to placate the authorities). This reasoning is plausible but flawed.

When a witness is biased in favor of one party or the other, this bias will not always manifest itself through inconsistent statements. A witness may repeatedly provide the same biased account of events. While a witness's bias may be helpful in explaining why the witness would give inconsistent statements concerning the events being litigated, it would seem all the more important for the disfavored party to introduce evidence of the witness's bias when the witness's statements are consistent (and thus presumptively more credible).

Moreover, Judge Curda's analysis (his ruling that Kameroff had to show that Carr's current version of events differed from his original account) implicitly rests on the assumption that Carr's initial account was truthful. The opposite may be the case. It

is conceivable that Carr, for whatever reason, falsely reported that Kameroff had taken his vehicle without permission; then, when Carr learned that his probation officer was considering filing a petition to revoke his probation, Carr felt obliged to stick to his original story rather than admit the truth (and thus admit that he had filed a false report). This potential ground of bias would lead Carr to make consistent statements, not inconsistent ones.

As this court noted in *Wood*, 837 P.2d at 746–47 (citations omitted),

[T]he [United States] Supreme Court has reaffirmed that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant...." Nevertheless, the Court has carefully distinguished between the imposition of "reasonable limits on" inquiry and the prohibition of "*all* inquiry into" specific areas of possible bias.

Here, Judge Curda did not simply limit Kameroff's inquiry into Carr's potential bias. Instead, the judge ruled that Kameroff could not introduce any evidence of Carr's probation status, and the state's recent consideration of a petition to revoke that probation, until Kameroff overcame the foundational hurdle of demonstrating that Carr had made inconsistent statements. As discussed above, bias can be at work even when all of a witness's statements are consistent. Thus, Judge Curda should not have required foundational proof that Carr had made inconsistent statements before allowing Kameroff to introduce evidence of Carr's probation status as a potential reason why Carr might be biased in favor of the government.

■ Because of this error, we reverse Kameroff's conviction for third-degree criminal mischief (joyriding). Carr's testimony appears to be crucial for the joyriding conviction, and the State presents no harmless error argument. However, Carr's testimony had essentially no impact on Kameroff's convictions for reckless driving, for driving while his license was suspended, and for resisting arrest. These three offenses were all independently established by police testimony. We therefore find that the improper restriction on Kameroff's cross-examination of Carr was harmless beyond a reasonable doubt as to these three offenses.

■ In the trial court, Kameroff unsuccessfully asked for a protective order prohibiting the State from introducing evidence that a marijuana pipe (containing marijuana residue) was found on Kameroff's person during a pat-down search following his traffic stop. On appeal, Kameroff renews his argument that evidence of the marijuana pipe should have been excluded because it was more prejudicial than probative. We disagree. This evidence tended to show that Kameroff had recently smoked marijuana, a matter of obvious relevance to the charge of driving while intoxicated.

Lastly, Kameroff raises various challenges to the composite sentence he received for his various convictions. Given our conclusion that Kameroff's convictions for criminal mischief, driving while intoxicated, and refusing to take a breath test must be reversed, Kameroff's sentencing arguments are now moot.

Kameroff's convictions for third-degree criminal mischief, driving while intoxicated, and refusing to submit to a breath test are REVERSED. Kameroff's convictions for reckless driving, driving while his license was suspended, and resisting arrest are AFFIRMED.